THE OVERLAND CORPORATION, FORMERLY WILLYS-OVERLAND MOTORS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27836. Filed September 16, 1960.

*Jay O. Kramer, Esq., Thomas J. Lynch, Esq.,* and *Gilbert I. Falk, C.P.A.,* for the petitioner.

*George LeBlanc, Esq.,* and *John W. Holt, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent denied petitioner's applications for relief and claims for refund of excess profits tax under section 722(b)(1), (b)(2), (b)(3), (b)(4), and (b)(5) of the Internal Revenue Code of 1939 for the fiscal years ended September

30, 1942 to 1945, inclusive, by his notice of disallowance mailed January 26, 1950.

The issues presented for our decision are:

1. Whether petitioner filed a timely claim for refund of its excess profits tax on the ground that it realized net abnormal income within the meaning of section 721(a)(2)(C) and (a)(3) of the 1939 Code. In the event we find that its claim for refund is timely filed, the further question is presented whether petitioner realized net abnormal income within the meaning of section 721(a)(2)(C) and (a)(3) during the years in issue which is attributable to other years under section 721(b).

2. Whether the respondent in his amended answer to the fourth amended petition made a timely claim for deficiencies in petitioner's excess profits tax for the fiscal years ended September 30, 1942 and 1943, on the ground that petitioner utilized an incorrect basis for computing depreciation, equity invested capital, and a net operating loss carryover from 1940 to 1942 on property received in 1936 in exchange for its stock pursuant to a plan of reorganization of the Willys-Overland Co. under section 77B of the Bankruptcy Act. If the deficiencies claimed by respondent are timely, the question is presented whether the basis of assets received by petitioner in 1936 is the fair market value of the assets at the time of acquisition or their basis in the hands of the transferors.

3. Whether or not petitioner is entitled to relief under section 722(b)(2) of the 1939 Code on the ground that its earnings during the base period were depressed by reason of temporary economic circumstances unusual in its experience.

4. Whether or not petitioner is entitled to relief under section 722(b)(4) of the Code on the ground that it commenced business immediately prior to the base period and failed to reach the earning level it would have attained had it commenced business 2 years earlier.

Additional issues presented by the pleadings have been settled on stipulation.

### GENERAL FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

The petitioner (known since 1953 as the Overland Corporation) was organized as Willys-Overland Motors, Inc., sometimes hereinafter referred to as petitioner or the new company, under the laws of the State of Delaware on July 25, 1936. It was one of two corporations created pursuant to the plan of reorganization of the Willys-Overland Company, sometimes hereinafter referred to as the old company, and Willys-Overland, Incorporated, under the provisions of section 77B of the Bankruptcy Act, as amended.

The Willys-Overland Company was organized under the laws of the State of Ohio on November 18, 1912. Substantially all of its business consisted of the manufacture and sale of automobiles and automobile parts. Its principal place of business and factories were located in Toledo, Ohio.

## Issue 1. Statute of Limitations—Section 322.

### FINDINGS OF FACT.

Petitioner's income and excess profits tax returns for the fiscal years ended September 30, 1942 to 1945, inclusive, were filed with the director of internal revenue at Toledo, Ohio. The petitioner's net liability for excess profits tax for the fiscal years ended September 30, 1942 to 1945, inclusive, as shown on its returns and as assessed by the respondent was paid as follows:

### 1942

| Year | Amount |
|---|---|
| Dec. 15, 1942 | $1,322,500.00 |
| Mar. 15, 1943 | 469,783.20 |
| June 15, 1943 | 896,141.58 |
| Sept. 15, 1943 | 896,141.60 |
| May 21, 1948 | 2,544,519.82 |
| Total | 6,129,086.20 |
| Less: Credit, July 5, 1944, pursuant to section 3806(b), I.R.C., against the amount of excessive profits reflected in renegotiation agreement dated Apr. 18, 1944 | 420,976.59 |
| Net payment of excess profits tax | 5,708,109.61 |

### 1943

| Year | | Amount |
|---|---|---|
| Dec. 15, 1943 | | $4,342,300.00 |
| Mar. 15, 1944 | | 4,342,086.66 |
| June 15, 1944 | | 4,342,193.33 |
| Sept. 15, 1944 | | 4,342,193.32 |
| May 21, 1948 | | 3,188,185.21 |
| Aug. 16, 1948 | | 1,142,719.82 |
| Total | | 21,699,678.34 |
| Less: Tentative credit, Jan. 15, 1948, pursuant to section 3806(b), I.R.C., against excessive profits determined by War Contracts Price Adjustment Board, then pending on appeal to the Tax Court as to the proper amount of such excessive profits | $9,600,000 | |
| Minus: Adjustment of such tentative credit pursuant to entry of decision of Tax Court, Dec. 19, 1949, in accordance with stipulation as to amount of excessive profits under Renegotiation Act | 560,000 | 9,040,000.00 |
| Net payments of excess profits tax | | 12,659,678.34 |

### 1944

| Year | | Amount |
|---|---|---|
| Dec. 15, 1944 | | $5, 720, 750. 00 |
| Mar. 15, 1945 | | 5, 720, 669. 80 |
| June 15, 1945 | | 5, 720, 709. 89 |
| Sept. 15, 1945 | | 3, 432, 425. 93 |
| Apr. 10, 1946 (Post-war credit) | | 2, 288, 283. 96 |
| July 15, 1948 | | 1, 397, 762. 74 |
| Sept. 14, 1948 (Post-war credit) | | 155, 306. 97 |
| Total | | 24, 435, 909. 29 |
| Less: Refund May 8, 1946, re: Tentative adjustment of amortization deduction under section 124, I.R.C., amended | $48, 205. 37 | |
| Plus: Post-war credit on above | 5, 356. 15 | |
| | | 53, 561. 52 |
| Less: Credit, Nov. 14, 1949, pursuant to section 3806(b), I.R.C., against the amount of excessive profits reflected in the renegotiation agreement dated Oct. 7, 1949 | 8, 637, 140. 80 | |
| Minus: Repayment, Dec. 9, 1949, of post-war credit included in above amount | 863, 714. 08 | |
| | | 7, 773, 426. 72 |
| Total refund and credit | | 7, 826, 988. 24 |
| Net payment of excess profits tax | | 16, 608, 921. 05 |

### 1945

| Year | Amount |
|---|---|
| Dec. 17, 1945 | $3, 687, 500. 00 |
| Mar. 15, 1946 | 3, 683, 453. 14 |
| June 15, 1946 | 3, 685, 710. 30 |
| Sept. 13, 1946 | 3, 686, 177. 74 |
| July 15, 1948 | 231, 967. 41 |
| Oct. 1, 1948 | 46, 892. 65 |
| Total | 15, 021, 701. 24 |
| Less: Credit, Nov. 14, 1949, pursuant to section 3806(b), I.R.C., against the amount of excessive profits reflected in renegotiation agreement dated Oct. 7, 1949 | 2, 452, 763. 52 |
| Net payment of excess profits tax | 12, 568, 937. 72 |

The dates on which petitioner's income and excess profits tax returns for the fiscal years ended September 30, 1942 to 1945, inclusive, were filed, together with the dates on which it filed applications for relief and claims for refund of excess profits tax under section 722, including the amounts claimed, and the dates on which the period of limitations with respect to each year expire are as follows:

| Fiscal year ended Sept. 30— | Return filed | Claim for refund filed | Amount claimed | Expiration of period of limitations |
|---|---|---|---|---|
| 1942 | Feb. 15, 1943 | Original application (Form 991) Feb. 15, 1943. | | Aug. 31, 1948 |
| | | Second application (Form 991) Sept. 15, 1943 | | |
| | | Amendment to application (Form 991) Dec. 26, 1945. | | |
| | | Claim for refund (Form 843) Nov. 27, 1945 | $3,584,566.38 | |
| | | Claim for refund (Form 843) Dec. 2, 1948 | 2,544,519.82 | |
| | | Claim for refund (Form 843) Jan. 2, 1957 | 5,670,818.34 | |
| 1943 | Feb. 15, 1944 | Original application (Form 991) Feb. 15, 1944 | | Aug. 31, 1948 |
| | | Amendment to application (Form 991) Dec. 26, 1945. | | |
| | | Claim for refund (Form 843) Nov. 27, 1945 | 8,112,972.48 | |
| | | Claim for refund (Form 843) Dec. 2, 1948 | 4,330,905.03 | |
| | | Claim for refund (Form 843) Jan. 2, 1957 | 9,442,519.37 | |
| 1944 | Feb. 13, 1945 | Original application (Form 991) Feb. 13, 1945 | | Sept. 30, 1948 |
| | | Amendment to application (Form 991) Dec. 6, 1948. | | |
| | | Claim for refund (Form 843) Nov. 27, 1945 | 2,566,287.99 | |
| | | Claim for refund (Form 843) Feb. 17, 1947 | 412,964.02 | |
| | | Claim for refund (Form 843) Dec. 2, 1948 | 7,170,468.17 | |
| | | Claim for refund (Form 843) Dec. 13, 1949 | 892,732.00 | |
| | | Claim for refund (Form 843) Jan. 2, 1957 | 11,419,056.51 | |
| 1945 | Feb. 5, 1946 | Original application (Form 991) Dec. 6, 1948 | | Dec. 15, 1948 |
| | | Claim for refund (Form 843) Sept. 22, 1949 | 34,681.10 | |
| | | Claim for refund (Form 843) Sept. 22, 1950 | 28,707.85 | |
| | | Claim for refund (Form 843) Jan. 1, 1957 | 1,705,735.29 | |

Except as indicated above, no other claim for refund of excess profits tax for the years in issue ever was filed by the petitioner.

On January 26, 1950, the respondent issued a notice of disallowance of petitioner's applications for relief under section 722.

Petitioner filed with this Court on April 21, 1950, its petition contesting the disallowance of relief under section 722 for the fiscal years ended September 30, 1942 to 1945, inclusive.

On January 29, 1954, petitioner moved to amend its petition to include the contention that the respondent was in error in rejecting its claim for refund of excess profits tax for the fiscal year ended September 30, 1945, by reason of denying a deduction claimed for overceiling payments to the United States because of unintentional violations of Office of Price Administration regulations. We denied petitioner's motion for leave to amend, because of lack of jurisdiction to consider a standard issue, on the basis of previous decisions in *Mutual Lumber Co.*, 16 T.C. 370; *Martin Weiner Corp.*, 21 T.C. 470; and *West Flagler Amusement Co.*, 21 T.C. 486. However, upon reversal of our order by the United States Court of Appeals for the Sixth Circuit in *Willys-Overland Motors* v. *Commissioner*, 219 F.2d 251, we granted petitioner's motion for leave to amend its petition on March 29, 1955, at which time the amendment was filed.

On April 19, 1955, the petitioner, pursuant to leave granted by this Court, filed an amended petition in which it claimed overpayments of excess profits tax for the fiscal years ended September 30, 1942 to 1945, inclusive, on the ground that it was entitled to eliminate from its taxable net income for those years certain abnormal income resulting from research and development within the meaning

of section 721(a)(2)(C) of the 1939 Code and attributable to prior years under section 721(b), relating to the production of the ¼-ton military vehicle known as the jeep.

The respondent filed an answer thereto on June 17, 1955, denying the petitioner's contentions and affirmatively asserting that the refund of excess profits tax sought in the amended petition on the basis of section 721 was barred by the expiration of the period of limitations prescribed by section 322 of the Code. On December 15, 1955, the parties filed a joint motion requesting the Court to sever and decide the question whether or not the overpayments of excess profits tax claimed by the petitioner pursuant to the provisions of section 721 were barred by the statute of limitations provided in section 322. This motion was denied on January 17, 1956.

OPINION.

The petitioner contends that the filing of its original applications for relief of excess profits tax under section 722 in effect suspends the operation of the statute of limitations under section 322(b) of the 1939 Code [1] and that since substantial payments of excess profits tax were made within 2 years prior to the filing of its petition under section 722 on April 21, 1950, to that extent the requirements of section 322(b) are satisfied. Therefore, the petitioner maintains that to the extent of the payments made within 2 years of the time its petition was filed, its claim for a refund of overpayment of excess profits tax on the basis of section 721 was timely and under the provisions of section 322(c) the running of the period of limitations is suspended until 90 days after entry of the final decision of this Court.

The respondent has taken the position that the petitioner's claim for refund based upon the realization of net abnormal income under section 721 is untimely under the provisions of section 322(b) of the Code which require that a claim for refund or credit must be made within 3 years from the time the return was filed or within 2 years from the date the tax was paid.

Section 322(b)(1) requires the filing of a claim for refund within 2 years from the time the tax was paid. However, this requirement is not satisfied here because no proper claim for refund relating to the overpayment claimed under section 721 was filed within 2 years from the time of payment. Under the petitioner's contentions, in

[1] SEC. 322. REFUNDS AND CREDITS.

(b) LIMITATION ON ALLOWANCE.—

(1) PERIOD OF LIMITATION.—Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. * * *

the event it pays a deficiency within 2 years before the mailing of a notice of disallowance of a claim for refund pursuant to section 732(a) and within 2 years prior to the filing of a petition with this Court, it would be entitled to claim an additional refund based upon a standard issue merely because we would have jurisdiction to find an overpayment under section 322(d).[2]  We are unable to find any support for such a contention, and petitioner cites none. (This particular contention was not involved in *H. Fendrich, Inc.*, 25 T.C. 262, reversed on other grounds 242 F.2d 803; discussed *infra*.)  Such a conclusion would result in an unwarranted extension of the basic statute of limitations provided in section 322.

Insofar as petitioner regards its applications for excess profits tax relief under section 722 for the fiscal years ended September 30, 1942 to 1945, inclusive, filed on February 15, 1943, February 15, 1944, February 13, 1945, and December 6, 1948, respectively, as the equivalent of claims for refund or credit with respect to the tax paid prior to their filing and refundable *for any reason stated therein*, it is correct in its assertion.  *H. Fendrich, Inc., supra.*  Regs. 112, sec. 35.722–5(c).  Such claims for refund or credit have the effect of suspending the operation of the period of limitations set forth in section 322(b) with respect to overpayments based upon the grounds contained therein.  *H. Fendrich, Inc., supra;* cf. secs. 722(d), 732(a), and 277.

An essential requirement for a proper claim for refund of tax is that it contain an explicit statement of each ground upon which

[2] SEC. 322(d)  OVERPAYMENT FOUND BY BOARD [Tax Court].—If the Board [Tax Court] finds that there is no deficiency and further finds that the taxpayer has made an overpayment of tax in respect of the taxable year in respect of which the Commissioner determined the deficiency, or finds that there is a deficiency but that the taxpayer has made an overpayment of tax in respect of such taxable year, the Board [Tax Court] shall have jurisdiction to determine the amount of such overpayment, and such amount shall, when the decision of the Board [Tax Court] has become final, be credited or refunded to the taxpayer.  No such credit or refund shall be made of any portion of the tax unless the Board [Tax Court] determines as part of its decision (1) that such portion was paid (A) within two years before the filing of the claim, the mailing of the notice of deficiency, or the execution of an agreement by both the Commissioner and the taxpayer pursuant to section 276(b) to extend beyond the time prescribed in section 275 the time within which the Commissioner might assess the tax, whichever is earliest, or (B) within three years before the filing of the claim, the mailing of the notice of deficiency, or the execution of the agreement, whichever is earliest, if the claim was filed, the notice of deficiency mailed, or the agreement executed within three years from the time the return was filed by the taxpayer, or (C) after the execution of such an agreement and before the expiration of the period within which the Commissioner might make an assessment pursuant to such agreement or any extension thereof, or (D) after the mailing of the notice of deficiency; or (2), if such portion was not paid within the period described in clause (1), but the notice of deficiency was mailed within seven years from the time prescribed for the filing of the return, or a claim described in subsection (b)(5) was filed, that such portion does not exceed the amount of the overpayment attributable to the deductibility of items described in subsection (b)(5); or (3), if such portion was not paid within the period described in clause (1), but the notice of deficiency was mailed within the period described in subsection (b)(6) for the filing of a claim for credit or refund of an overpayment attributable to a carry-back, or such a claim was filed, that such portion does not exceed the amount of the overpayment attributable to a carry-back.

the claim for refund or credit is based, together with facts sufficient to apprise the respondent of the basis thereof. Regs. 111, sec. 29.322–3; *Keneipp* v. *United States*, 184 F.2d 263.

It is firmly established as a matter of law that a timely claim for refund of an overpayment of tax upon a specific ground may not be amended after the expiration of the statute of limitations prescribed with respect to the filing of refund claims so as to set forth a new and unrelated ground. *United States* v. *Andrews*, 302 U.S. 517; *United States* v. *Garbutt Oil Co.*, 302 U.S. 528; *United States* v. *Henry Prentiss & Co.*, 288 U.S. 73; *Real Estate Title Co.* v. *United States*, 309 U.S. 13.

The applications for excess profits tax relief filed by petitioner herein related solely to grounds for relief based upon section 722. They did not contain as a ground for relief the assertion that petitioner's excess profits tax net income was in part due to the realization of net abnormal income resulting from research and development within the meaning of section 721(a)(2)(C), and contained no facts from which such a claim, if made, could have been supported.

After December 6, 1948, the petitioner filed no additional claim for refund of excess profits tax for any of the years here in issue. The petitioner asserted for the first time in its amended petition filed herein on April 19, 1955, that it was entitled to eliminate from its excess profits net income for the years in question certain amounts which were abnormal and attributable to prior years under section 721.

Our decision in *May Broadcasting Co.*, 33 T.C. 1007, on appeal (C.A. 8), is in point here. There, the taxpayer timely filed its income and excess profits tax return for 1942. On November 30, 1944, it filed with the respondent an application for relief under section 722 in which it claimed a refund for 1942 in the amount of $8,417.59. No additional claim for refund of excess profits tax for 1942 was filed. On February 23, 1954, the respondent issued a notice of deficiency and partial disallowance of the taxpayer's application for relief under section 722. The taxpayer filed with this Court on May 20, 1954, a petition in which it claimed an overpayment in the amount of $6,392.16 for 1942. It stated for the first time in the petition that the amount of its equity invested capital should be increased.

Following our previous decision in *H. Fendrich, Inc.*, *supra*, we held that the refund claimed by the May Broadcasting Company based upon the use of an increased invested capital credit, asserted for the first time in its petition filed with this Court on May 20, 1954, more than 11 years after its return for 1942 was filed, and more than 9 years after its excess profits tax for 1942 was paid,

was untimely because of the expiration of the period of limitations provided in section 322(b). In our opinion in *May Broadcasting Co., supra*, we pointed out that applications for excess profits tax relief under section 722 of the 1939 Code operate to suspend the running of the period of limitations prescribed in section 322(b) only with respect to overpayments based upon the specific grounds asserted therein, but not with respect to new and unrelated grounds asserted for the first time after the period of limitations provided in section 322(b) has expired.

In *H. Fendrich, Inc., supra*, the taxpayer filed applications for excess profits tax relief under section 722 for 1943, 1944, and 1945 during the years 1948, 1945, and 1946, respectively. On May 12, 1949, it filed an additional claim for refund for 1943, 1944, and 1945 on the further ground that its invested capital should be increased for each of those years in an amount representing the value of its goodwill. After the Commissioner issued a notice disallowing in full the taxpayer's applications for relief under section 722, it filed a petition with this Court. We there sustained the respondent's contention that the refund of overpayment was barred by the limitation provisions of section 322(b) because the claim relating to the increase in invested capital was not raised until more than 3 years from the time the return was filed and more than 2 years from the date the tax was paid.

Inasmuch as petitioner herein did not claim a refund of overpayment of excess profits tax for the fiscal years ended September 30, 1942 to 1945, inclusive, based upon section 721 until April 19, 1955, or more than 9 years from the time its return was filed and more than 6 years from the time the tax was paid, its additional claim for refund under section 721 is barred by the statute of limitations set forth in section 322(b) of the 1939 Code. Since the petitioner's claim for refund of excess profits tax under section 721 is untimely, the question whether it realized net abnormal income within the meaning of section 721(a)(2)(C) and (a)(3) which would be attributable to other years under section 721(b) need not be decided.

*Issue 2. Statute of Limitations—Section 275(a).*

### FINDINGS OF FACT.

On July 28, 1958, respondent filed an amended answer to the fourth amended petition in which he claimed deficiencies in petitioner's excess profits tax for the fiscal years ended September 30, 1942 and 1943, in the amounts of $1,159,295.86 and $959,195.42, respectively. The respondent also asserted he had erroneously concluded the reorganization to which the petitioner was a party and

pursuant to which it had acquired assets on August 31, 1936, was a taxable transaction, whereas he now claims that the transaction was nontaxable under section 112(b)(5) of the 1939 Code. Consequently, the respondent contends that he had erroneously regarded the basis of the assets acquired by petitioner on August 31, 1936, as their fair market value on that date, whereas the proper basis of the assets for purposes of computing depreciation, gain or loss on a sale, or an exchange, and the invested capital credit is the basis in the hands of the transferors (the bondholders and creditors of the old company). No statutory notice of deficiency in income taxes has been mailed by the respondent.

On August 21, 1958, the petitioner filed a motion to strike from the amended answer to the fourth amended petition the respondent's claim for deficiencies in petitioner's excess profits taxes for 1942 and 1943. On December 2, 1958, we granted the petitioner's motion to strike certain matter from the respondent's amended answer to the fourth amended petition on the ground that the claim for deficiencies was untimely. On December 31, 1958, the respondent filed a motion requesting reconsideration of our order of December 2, 1958. By order dated February 13, 1959, we took under advisement the foregoing motion for reconsideration filed by the respondent and ordered that final decision thereon would be made at the time of our decision on the merits as to all of the issues between the parties.

The waiver executed by the petitioner and the respondent, pursuant to section 276(b) of the 1939 Code, extending the period for the assessment of deficiencies for the fiscal year ended September 30, 1942, expired on August 31, 1948, and the waiver executed for the fiscal year ended September 30, 1943, expired on August 31, 1948. The respondent's notice of disallowance of petitioner's claims for refund under section 722 was mailed on January 26, 1950.

OPINION.

It is apparent that the period of limitations provided in section 275(a) of the 1939 Code [3] (as extended by waivers) controlling the time during which the respondent may properly determine deficiencies had expired when his notice of disallowance of petitioner's claims for excess profits tax relief was mailed on January 26, 1950. In *F. W. Poe Manufacturing Co.*, 25 T.C. 691, affd. 245 F. 2d 8,

---

[3] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.

Except as provided in section 276—

(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

the taxpayer filed its income and excess profits tax returns for 1941 and 1942. On September 15, 1943, the taxpayer timely filed applications for relief under section 722. On November 17, 1944, it executed a waiver of restrictions on the assessment and collection of deficiencies in tax and paid the deficiencies proposed by the respondent's agent. On November 2, 1951, the Commissioner issued a notice of disallowance and statutory notice of deficiency disallowing in full the claims for relief under section 722 and determining deficiencies in the taxpayer's income and excess profits taxes for 1941 and 1942. The taxpayer filed a petition with this Court and the Commissioner subsequently was granted leave to file an amended answer in which it was claimed for the first time that the taxpayer was liable for an increased deficiency in excess profits taxes for 1941 and 1942. We held that the assessment of any deficiencies for the years there in question was barred by the expiration of the period of limitations prescribed by section 275(a) of the Code, and that respondent's claim for additional deficiencies was untimely since it was barred at the time the notice of disallowance was issued.

In *Commissioner* v. *S. Frieder & Sons Co.*, 247 F. 2d 834, affirming a Memorandum Opinion of this Court, the Court of Appeals for the Third Circuit likewise held that a claim for deficiency asserted by the Commissioner for the first time in his answer to a petition filed with this Court based upon disallowance of a section 722 claim is untimely if it was barred by the statute of limitations (section 275(a)) when the notice of disallowance was mailed.

Subsequent to August 31, 1948, the respondent was barred from claiming deficiencies in petitioner's taxes for the fiscal years ended September 30, 1942 and 1943. Accordingly, the respondent's claim for deficiencies contained in his amended answer to the fourth amended petition filed on July 28, 1958, was barred at the time the notice of disallowance was issued on January 26, 1950, and therefore was untimely, having been asserted for the first time approximately 10 years after the period of limitations prescribed in section 275(a), as extended by waivers, for the assessment and collection of deficiencies in tax had expired.

*Issues 3 and 4—Section 722.*

FINDINGS OF FACT.

On February 15, 1933, the old company involuntarily was placed in receivership by the United States District Court for the Northern District of Ohio, Western Division. On December 30, 1933, David R. Wilson was appointed by the court to fill a vacancy as coreceiver, and upon the death of John M. Willys, the other coreceiver, on

August 25, 1935, David R. Wilson became sole receiver of the old company.

On February 15, 1933, there remained unpaid (from an original issue of $10 million, which had been issued at a discount by the old company as of September 1, 1923) 6½% First Mortgage Sinking Fund Gold Bonds in the principal amount of $2 million, payable September 1, 1933, plus interest thereon from September 1, 1932. Default in the payment of the interest due on these bonds on March 1, 1933, resulted in the creation of a bondholder's protective committee by deposit agreement dated March 30, 1933. More than a majority of the outstanding bonds of the old company were deposited under this agreement.

On July 18, 1933, the trustee under the aforementioned bond issue filed a suit in the United States District Court for the foreclosure of the lien of the indenture of mortgage securing said bonds. A creditor's committee contested the claim of the mortgage trustee as to a lien on certain machinery and equipment and as to certain indebtedness alleged to be due to the parent company from its subsidiary companies on the ground that such property was not in existence at the time of the execution of the indenture of mortgage. The court appointed a special master to take the evidence and report his findings on the issues thus raised by the creditor's committee. The hearings of the special master were not concluded in 1936, and it was then estimated that if the litigation was continued a final decision could not be rendered for several years.

During 1933, the receivers completed the manufacture of the inventory on hand February 15, 1933, and sold the automobiles so manufactured as well as the unsold cars on hand on February 15. In the latter part of 1933, the receivers developed a manufacturing program, which, however, met with opposition. After a hearing, the court granted authority to the receivers to manufacture automobiles on a restricted basis. Changes were made in the hood and radiator of the automobiles during 1934 and 1935. In January 1936, the court authorized the manufacture of 15,000 additional automobiles which were known as the Willys 77.

On December 7, 1934, a petition for the reorganization of Willys-Overland, Incorporated, a wholly owned subsidiary of the Willys-Overland Company, under section 77B of the Bankruptcy Act, as amended, was filed with the United States District Court for the Northern District of Ohio, Western Division. By order of the court, this case was later consolidated with reorganization proceedings under section 77B of the Bankruptcy Act filed by the old company on February 25, 1936, as hereinafter stated.

Empire Securities, Inc., was organized under the laws of Delaware on August 21, 1935, and entered into negotiations with the

various committees representing creditors of the old company. It offered to purchase the bonds of the old company, including unpaid interest, at about 70 per cent of the face value of the bonds and unsecured claims at about 25 per cent of the face value of the claims. In some instances, bonds and unsecured claims were purchased for less than these amounts.

On February 25, 1936, the old company filed with the United States District Court for the Northern District of Ohio, Western Division, a petition for reorganization under section 77B of the Bankruptcy Act, as amended, and the court, on the same day, approved the petition and appointed David R. Wilson (then the receiver) a temporary trustee of its assets and authorized him to continue the business. David R. Wilson was appointed permanent trustee on March 20, 1936, and continued as such until confirmation of the plan of reorganization on August 28, 1936.

The sales, cost of sales, gross profits, expenses, and net profits of the receivers and of the trustee, for the period March 1933 through August 1936, were as follows:

| | Feb. 15–Dec. 31, 1933 | 1934 | 1935 | Jan. 1–Aug. 31, 1936 |
|---|---|---|---|---|
| Sales: | | | | |
| New cars | $6,986,234 | $1,792,118 | $4,352,125 | $4,028,915 |
| Car extras | 107,925 | 22,321 | 95,247 | 138,962 |
| Service parts | 441,868 | 230,664 | 81,297 | 60,288 |
| Production parts sold to Willys-Overland Pacific Co | 590,782 | 725,179 | 2,331,970 | 1,894,698 |
| Total | 8,126,810 | 2,770,282 | 6,860,639 | 6,122,863 |
| Cost of sales | 8,353,162 | 2,661,353 | 6,249,870 | 5,458,467 |
| Gross profit on sales | (226,352) | 108,929 | 610,769 | 664,397 |
| Other income | 195,559 | 82,654 | 92,769 | 77,101 |
| Total income | (30,793) | 191,582 | 703,538 | 741,498 |
| Expenses | 810,080 | 1,144,449 | 1,004,718 | 609,009 |
| Net profit (or loss) | (840,873) | (952,867) | (301,180) | 132,489 |

The unit sales of new cars (including parts sets sold to Willys-Overland Pacific Company for assembly) during the period February 15, 1933, to August 31, 1936, were as follows:

| | Willys-Overland Pacific plant | Export | Others | Total |
|---|---|---|---|---|
| Feb. 15–Dec. 31, 1933 | 2,535 | 3,048 | 10,231 | 15,814 |
| 1934 | 2,700 | 1,893 | 3,323 | 7,916 |
| 1935 | 8,003 | 5,499 | 6,926 | 20,428 |
| Jan. 1–Aug. 31, 1936 | 1 6,500 | 5,650 | 5,393 | 17,543 |

1 Estimate derived from unit cost of production parts sold in 1935.

On July 24, 1936, Empire Securities, Inc., as the owner of $1,415,000 of the 6½% First Mortgage Sinking Fund Gold Bonds, $2,741 of mechanics lien claims, and $5,717,604.96 of the general

unsecured claims against the Willys-Overland Company, and $64,299.36 of the general unsecured claims against Willys-Overland, Inc., submitted to the United States District Court having jurisdiction of the matter, a proposed plan of reorganization of the Willys-Overland Company and Willys-Overland, Incorporated. Including the expenses attributable thereto, the $1,415,000 bonds of the old company owned by Empire Securities, Inc., had cost it $1,043,564.22, and the total unsecured claims against the two debtor companies, aggregating $5,781,904.32 owned by Empire Securities, Inc., had cost it $1,493,730.52.

The plan of reorganization, as amended, was, after a hearing, confirmed by the United States District Court for the Northern District of Ohio, Western Division, on August 28, 1936. On September 28, 1936, a dissatisfied stockholder of the old company filed a motion in the United States Court of Appeals for the Sixth Circuit requesting leave to appeal from the aforementioned order of confirmation. Such motion was opposed by the trustee of the old company and by Empire Securities, Inc., and, after consideration of briefs in the matter, the Court of Appeals on October 6, 1936, denied the petition for leave to appeal and struck it from the files. The District Court entered its final decree on April 23, 1937.

The court, in its order of August 28, 1936, found:

(1) That the aggregate of the property of the old company at a fair value thereof was not sufficient in amount to pay the debts of the old company and that the old company was insolvent.

(2) That the aggregate of the property of Willys-Overland, Inc., at a fair value thereof was not sufficient in amount to pay its debts and that Willys-Overland, Inc., was insolvent.

(3) That the holders of the preferred and common stock of the old company had no equity in the property of the old company; and that the old company as the holder of stock of Willys-Overland, Inc., had no equity in Willys-Overland, Inc., by virtue of the shares of stock held by it.

(4) That the plan of reorganization was fair and equitable and did not discriminate unfairly in favor of any class of creditors or stockholders of the old company or of Willys-Overland, Inc., and was feasible.

(5) That each issuance, transfer, or exchange of securities, including stock of any class, warrants, certificates of subscription rights, certificates of subscription privileges, scrip, including shares of stock to be issued for the purpose of raising new money for working capital, and shares of stock to be distributed to creditors of each of the debtors, and for all other purposes stated in the plan, which

by such court order were directed, provided for or necessary to be made, including the issuance, transfer, or exchange of any securities by or to either of the trustees or to any distributing agent, and the making and delivery of the respective conveyances pursuant to the terms of such court order, were all to make the plan effective, and such securities were to be issued pursuant to the plan by its order confirmed in accordance with the provisions of section 77B.

(6) That the consideration for the issuance by the new company of its capital stock and by the Willys Real Estate Realization Corporation of its stock pursuant to the plan and court order was adequate and that the shares of stock, when issued, would be fully paid and nonassessable.

Under the plan of reorganization, as confirmed by the court, the assets of the old company were transferred to two new corporations— Willys-Overland Motors, Inc., the petitioner herein, an operating company, and the Willys Real Estate Realization Corporation, sometimes hereinafter referred to as the Realization Corporation, which was chartered on or about August 21, 1936, under the laws of Delaware for the purpose of liquidating the properties received by it.

The court-approved plan of reorganization, as amended, provided that the authorized capital stock of the new company (petitioner) was to consist of 350,000 shares of 6% Convertible Preferred Stock (cumulative) of the par value of $10 per share, all of which was to be outstanding under the plan (subject to reduction, however, to the extent that holders of gold bonds, other than Empire, elected to take only common stock of the new company pursuant to the provisions of the plan), and 2,850,000 shares of common stock having a par value of $1 per share, of which there would be outstanding 1,959,050 shares (which latter amount was subject to increase to the extent that holders of gold bonds, other than Empire, elected to take only common stock of the new company pursuant to the provisions of the plan). Both the preferred and common stock were voting stock.

The plan of reorganization, as amended, further provided that all shares of preferred stock of the new company to be outstanding under the plan were to be issued for cash at $10 per share, and were to be fully paid and nonassessable. Holders of gold bonds (other than Empire) were entitled to receive a total of 40,950 shares of preferred stock if they so elected, and in connection with such right, and even though any of the holders of said bonds elected to take only common stock of the new company, the trustee was to pay into the new company the sum of $409,500. The remaining 309,050 shares of preferred stock were to be issued for cash at $10 per share pursuant to the offering for subscription and the under-

writing provided for therein. Additional shares of common stock were authorized and issued under the plan to underwriters and new subscribers for the purpose of raising $3,500,000 in new working capital. It was further provided in said plan that all shares of preferred stock issued thereunder to holders of gold bonds and all shares of common stock to be outstanding under the plan were to be issued for and in consideration of the payment by the trustee to the new company of $409,500 and the transfer, assignment, conveyance, and delivery of the properties and assets, real and personal, and were to be fully paid and nonassessable.

The authorized capital stock of the Realization Corporation was to consist of 77,000 shares of 5 per cent cumulative preferred stock having par value of $25 per share and 6,000 shares of common stock having par value of $1 per share. All shares of such stock to be outstanding under the plan were to be fully paid and nonassessable, and it was contemplated that all of the common stock and so much of the preferred stock as was necessary for distribution to holders of gold bonds and unsecured claims would be so outstanding. The plan also provided that within 60 days from the date on which the new securities were ready for distribution, the Realization Corporation would purchase for cancellation and retirement at $20 per share, any shares of preferred stock tendered to it.

Each holder of $1,000 face amount of gold bonds was entitled to receive 70 shares of preferred stock of the new company (or, at the option of the bondholder, 210 shares of the common stock of the new company) together with 22 shares of preferred stock of the Realization Corporation.

Each holder of an unsecured claim against the old company, and Willys-Overland, Inc., which was approved by the court, was entitled to receive, at his option, either cash from the trustee of the debtor corporation (at the rate of 25 per cent of the face amount of his claim), or 5 per cent cumulative preferred stock of the Realization Corporation, equal at its par value to 12½ per cent of the principal amount of his claims, plus a pro rata proportion (based on the principal amount of claims owned by creditors electing to participate under said option) in 1,102,850 shares of the common stock of the new company and in 6,000 shares of the common stock of the Realization Corporation.

Empire Securities, Inc., as the holder of $1,415,000 principal amount of gold bonds elected to receive 297,150 shares of the common stock of the new company and 31,130 shares of the preferred stock of the Realization Corporation by reason thereof. Further, Empire Securities, Inc., as the holder of unsecured claims of $5,717,604.96 against the old company, and as the holder of unse-

cured claims of $64,299.36, against Willys-Overland, Inc., or total unsecured claims of $5,781,904.32, elected to receive 1,102,850 shares of the common stock of the new company and 28,909 shares of the preferred stock and 6,000 shares of the common stock of the Realization Corporation in satisfaction of its general unsecured claims against the two debtor corporations. Empire Securities, Inc., as the holder of mechanics liens amounting to $2,741 received 100 per cent of the face amount thereof in cash from the trustee of the old company pursuant to the provisions of Article Fourth of the court's order and decree.

Prior to September 15, 1936, the date as of which the shares of stock of the new company and of the Realization Corporation issuable pursuant to Articles Eighth and Tenth of the court's order, were to be issued, holders of gold bonds (other than Empire Securities, Inc.) entitled to receive 11,585 shares of the preferred stock of the new company elected to receive 34,755 shares of the common stock of the new company in lieu thereof, as provided in Article Tenth of the court's order and decree. Accordingly, as of September 15, 1936, certificates for 29,365 shares of the preferred stock of the new company were issued to or for the benefit of bondholders not electing to receive common stock under the aforementioned option. Later, and subsequent to October 31, 1936, 51,450 additional shares of common stock of the new company were issued in lieu of 17,150 shares of preferred stock pursuant to such election. Thus, bondholders, other than Empire Securities, Inc., ultimately received 12,215 shares of preferred stock and 86,205 shares of the common stock of the new company, and 12,870 shares of the preferred stock of the Realization Corporation by reason of their $585,000-par-value, 6½% First Mortgage Sinking Fund Gold Bonds of the old company, plus unpaid interest, pursuant to the plan of reorganization.

The holders of unsecured claims against the two debtor corporations, other than Empire Securities, Inc., elected to receive cash from the trustees of the respective debtors, as provided in Article Fourth of the court's order, in the total amount of $41,008.58 in satisfaction of such unsecured claims aggregating $164,034.33.

For the purpose of providing working capital for the new company of approximately $3,500,000, as deemed advisable by the trustee and his consulting engineers, Sanderson & Porter, so as to enable petitioner to operate at the rate contemplated, the plan of reorganization provided for the offering for subscription and sale of additional new securities of the new company for cash. This amount was to be raised (1) through the payment to it by the trustee of $409,500 for 40,950 shares of preferred stock which were issuable to holders of gold bonds (other than Empire Securities, Inc.),

upon their election, and (2) the sale of the remaining 309,050 shares of preferred stock, together with a like number of shares of common stock of the new company in units consisting of 1 share of each at $10 per unit. All common shares of the new company accompanying shares of preferred stock of the new company deliverable to the purchasers of units were issued in the first instance against the properties acquired by the new company. According to the plan of reorganization, all shares of preferred stock to be outstanding thereunder were to be issued for cash at $10 per share and were to be fully paid and nonassessable.

The court-approved plan of reorganization did not provide for participation by the stockholders of the old company, except that, under Article Seventeenth of the court's order, they were given a prior right for a period of 35 days from the entry of the court's order to subscribe to the aforementioned 309,050 units on the basis of 1 unit for each share of preferred stock of the old company owned, and 1 unit for each 17 shares of the common stock of the old company so held. Such prior rights were to be evidenced by subscription certificates which were to be issued within 10 days of the entry of the order.

Subject to the prior rights of the stockholders of the old company to subscribe for the 309,050 units of preferred and common stock provided in the court's order, the bondholders, unsecured creditors, assignors of unsecured claims to Empire, and stockholders of the old company were entitled to subscribe for the 309,050 units.

The plan of reorganization contemplated that an underwriting agreement in the form designated would be executed by Empire and E. H. Rollins & Sons, Inc., as the underwriters' representative, which would assure the sale of the 309,050 units of preferred and common stock provided in the plan and thus accomplish the purpose thereof.

Subscribers who exercised subscription rights and privileges granted to holders of bonds, unsecured claims, and preferred and common stock of the Willys-Overland Company, by the plan of reorganization, as confirmed by the court, received 110,541 shares of common stock and 110,541 shares of preferred stock of Willys-Overland Motors, Inc., at a cost of $10 per unit of 1 share of fully paid and nonassessable common stock and 1 share of fully paid and nonassessable preferred stock. Identical units of 1 share of common stock and 1 share of preferred stock were delivered to the underwriters, or their nominees, at a price of $10 per unit, in the amount of 198,509 units.

In accordance with the provisions of the second part of the underwriting agreement between Empire Securities, Inc., and E. H.

Rollins & Sons, Inc., petitioner delivered to the underwriters and to the underwriters' representative a total of 250,000 shares of fully paid and nonassessable common stock of Willys-Overland Motors, Inc. (petitioner), in part consideration of the services rendered by them in the underwriting. Included therein were 50,000 shares delivered to the underwriters' representative for its services in working out plans for, and advising with respect to, the financing of the petitioner; and for its services in connection with the underwriting contemplated by the agreement. Petitioner also paid $175,000 to the underwriters' representative for services to be rendered in connection with the plan of reorganization.

A summary of the securities issued by the petitioner pursuant to the plan of reorganization, as amended, and as confirmed by the court, is shown in the "Application for Registration Pursuant to Section 12(b) and (c) of the Securities Exchange Act of 1934" (Form 22) filed by the petitioner with the Securities and Exchange Commission on August 3, 1937, as follows:

### Preferred Shares.

1. 29,365 shares were issued to or for the benefit of holders of 6½% Gold Bonds of the Willys-Overland Company, pursuant to the plan of reorganization, in part consideration of the assets transferred to the petitioner by the trustee in the reorganization proceedings. After October 31, 1936, 17,150 shares of this preferred stock were exchanged for 51,450 shares of common stock pursuant to the option granted the bondholders in Article Tenth of the court's order and decree of August 28, 1936.

2. 110,541 preferred shares were issued in units consisting of 1 common and 1 preferred share, at $10 a unit, to subscribers exercising the subscription rights and privileges granted by the plan to holders of bonds and claims and preferred and common stock of the Willys-Overland Company.

3. 198,509 shares were issued to underwriters at a price of $10 for a unit consisting of 1 common and 1 preferred share.

4. 11,585 shares were not issued because of the election of certain bondholders of the Willys-Overland common stock to receive common stock, in lieu of preferred.

### Common Shares.

The amendments to the plan of reorganization provided as follows:

All shares of preferred stock of the New Company to be outstanding under the Plan are to be issued for cash at $10.00 per share and are to be fully paid and non-assessable. 40,950 of said shares of Preferred Stock are distributable

to holders of Gold Bonds (other than Empire) if they so elect, and in connection with such right, and even though any of the holders of said bonds elect to take only Common Stock of the New Company, the Trustee is to pay into the New Company $409,500.00. The remaining 309,050 shares of Preferred Stock of the New Company are to be issued for cash at $10.00 per share pursuant to the offering for subscription and the underwriting hereinafter provided for.

All shares of Preferred Stock of the New Company issued under the Plan to holders of Gold Bonds and all shares of Common Stock of the New Company to be outstanding under the Plan are to be issued for and in consideration of the payment by the Trustee to the New Company of $409,500.00 and the transfer, assignment, conveyance and delivery to it of the properties and assets, real and personal, described in Exhibit 2 hereof and are to be fully paid and non-assessable.

Prior to the confirmation and approval of the plan and as a part thereof, Empire Securities, Inc., had agreed, under the option provided in the amendments to the plan, to accept 210 shares of common stock of the new company for each $1,000 gold bond held by it, and 105 shares of common stock for each $500 gold bond so held. The holders of gold bonds other than Empire were entitled to receive 40,950 shares of preferred stock, as mentioned above, for which the new company was to receive $409,500. However, these holders were given the election to receive common shares upon the same basis as Empire, viz, 210 shares for each $1,000 gold bond and 105 shares for each $500 bond, and the holders of bonds entitling them to receive 11,585 preferred shares elected to receive in lieu thereof, 34,755 common shares.

As a result, the common shares issued and outstanding pursuant to the plan, as of October 31, 1936, amounted to 1,993,805 shares, and were issued for the following considerations:

1. 34,755 shares were issued to holders of 6½% Gold Bonds of the Willys-Overland Company, who elected to receive them in lieu of the 11,585 preferred shares to which they were entitled on the basis of 3 common shares in lieu of 1 preferred share. These shares plus the 29,365 preferred shares referred to above, were issued in consideration of the sum of $409,500 paid the new company by the trustee. (Later, and subsequent to October 31, 1936, the bondholders entitled to receive 17,150 of the aforementioned 29,365 preferred shares elected to receive 51,450 common shares in lieu thereof.)

2. 297,150 shares were issued pursuant to the plan to the remaining bondholder (Empire Securities, Inc.) in part consideration of the property and assets, real and personal, acquired by the petitioner from its insolvent predecessor.

3. 1,102,850 shares were issued to unsecured creditors of the Willys-Overland Company and Willys-Overland, Inc., who elected to receive them in lieu of 25 per cent of the face value of their

claims in cash, in part consideration of the property and assets, real and personal, acquired by the petitioner from its insolvent predecessor pursuant to the plan of reorganization. Empire Securities, Inc., received this entire amount of stock.

4. 250,000 shares were issued in part consideration of the property and assets, real and personal, acquired by the petitioner from the Willys-Overland Company and Willys-Overland, Inc., and were delivered to the underwriters and their representative, for services rendered in connection with the financing of the petitioner and the consummation of the plan.

5. 110,541 shares were issued in part consideration of the property and assets, real and personal, acquired by the petitioner from the Willys-Overland Company and Willys-Overland, Inc. (a wholly owned subsidiary of Willys-Overland Co.). One of said common shares was issued to subscribers who exercised subscription rights granted by the plan to holders of bonds and claims. One share of preferred stock and one share of common stock were issued together as a unit at a cost of $10 per unit. None of the stockholders of Willys-Overland, Inc., participated in the subscription to petitioner's preferred and common stock in units.

6. 198,509 shares were issued in part consideration of the property and assets, real and personal, acquired by the petitioner from the Willys-Overland Company and Willys-Overland, Inc., and 1 of said common shares was delivered to underwriters with each preferred share purchased by them at the price of $10, said 1 preferred share and 1 common share comprising a unit.

A total of 1,993,805 common shares was issued.

Pursuant to Articles Ninth and Eleventh of the court's order of August 28, 1936, the petitioner received from the trustee of the old company and of Willys-Overland, Inc., in addition to cash in the amount of $409,500 (or its equivalent), assets having book value on the books of the respective debtors, as shown in the trustee's reports, as follows:

*Distributed to Willys-Overland Motors, Inc.*
By Trustee of Willys-Overland Company:
    Property Accounts:

| | | |
|---|---|---|
| Land | $213, 232. 44 | |
| Buildings and building equipment | 6, 100, 589. 34 | |
| Machinery and equipment | 2, 394, 452. 28 | |
| Tools, dies, jigs and fixtures—net | 2, 691, 843. 34 | |
| | | $11, 400, 117. 40 |
| Stock of Willys-Overland Parts Corporation | | 192, 000. 00 |
| Inventory (Excluding production inventory) | | 99, 570. 93 |
| Total Amount Exhibit VI of Ex. A of Trustee's Report dated April 5, 1937 | | 11, 691, 688. 33 |

*Distributed to Willys-Overland Motors, Inc.—Continued*

By Trustee of Willys-Overland, Inc.:

| | |
|---|---|
| Stock of Willys-Overland Pacific Co | $500, 000. 00 |
| Stock of Willys-Export Corporation | 575, 000. 00 |

Total Amount Exhibit VI of Ex. B. of Trustee's Report dated April 5, 1937 _____ $1, 075, 000. 00

Total Distribution per Trustee's Report _____ $12, 766, 688. 33

The properties of the old company and of Willys-Overland, Inc., which were deemed unnecessary to the operation of the business of manufacturing and selling automobiles were conveyed to Realization Corporation, which corporation acquired also all properties and cash in the hands of the trustee of the old company and of Willys-Overland, Inc., except (1) all sums required for payments and distributions pursuant to the provisions of the plan and the orders of the court, (2) payment to the new company (petitioner herein) of $409,500 in cash, or equivalent, as provided for under the plan, and (3) the assets acquired by the new company. The assets, at the book value reflected on the books of the respective debtors, as shown in the trustee's report, so acquired by the Realization Corporation were as above noted.

The "going concern" value determined by West Brothers, Inc., the appraisers employed by the trustee with the court's approval, for the land, buildings, and equipment of the Willys-Overland Company, which were transferred to the petitioner, adjusted for depreciation to August 31, 1936, at rates recommended by such appraisers, amounted to $9,476,358.30 in the aggregate and was classified as follows:

| | Going concern value Aug. 31, 1936 | Depreciation rate recommended |
|---|---|---|
| | | *Per cent* |
| Land | $219, 235. 00 | |
| Buildings and building equipment | 4, 716, 790. 55 | 2 |
| Machinery | 1, 933, 424. 28 | 5 |
| General factory equipment | 814, 940 34 | 6 |
| Power transmission | 729, 345. 63 | 5 |
| Automobiles and trucks in service | 7, 836. 33 | 50 |
| Office equipment | 113, 098. 01 | 8 |
| Dies, jigs and fixtures (non-current) | 362, 385. 93 | |
| Tools (non-current): | | |
| Perishable tools | 146, 305. 45 | |
| Durable tools | 364, 106. 78 | |
| Patterns | 68, 890. 00 | 33⅓ |
| Total | 9, 476, 358. 30 | |

The values at which the assets, exclusive of cash, were received by petitioner pursuant to the plan of reorganization of the Willys-Overland Company and Willys-Overland, Inc., and the par value of the capital stock issued to or for the benefit of the bondholders

of the Willys-Overland Company and the unsecured creditors of the Willys-Overland Company and Willys-Overland, Inc., in exchange therefor in accordance with Articles Tenth and Twenty-sixth of the court's order and decree, as recorded on the books of the petitioner, are shown in the following summary:

| | | |
|---|---:|---:|
| Cash | $183, 000. 00 | |
| Credit for sums payable by new company to trustee per Article Eleventh of court's decree tentatively estimated at | 226, 500. 00 | |
| Total (per Article Ninth of order) | | $409, 500. 00 |
| Nonproductive inventory | | 99, 570. 93 |
| Investments in subsidiaries: | | |
| Willys-Overland Pacific Company | 1, 137, 693. 96 | |
| Willys-Export Corporation | 130, 757. 41 | |
| Willys-Overland Parts Corporation | 49, 660. 89 | |
| | | 1, 318, 112. 26 |
| Property, plant and equipment | | 9, 476, 358. 30 |
| Total assets | | 11, 303, 541. 49 |
| Less: Par value of capital stock issued therefor: | | |
| Preferred stock to bondholders | 294, 350. 00 | |
| Common stock to bondholders of Willys-Overland Company | 331, 695. 00 | |
| To unsecured creditors of Willys-Overland Co. and Willys-Overland, Inc | 1, 102, 850. 00 | |
| To subscribers and underwriters (with preferred stock) | 309, 050. 00 | |
| To underwriters (par. 14, 15 and 16 of Underwriters Agreement) | 250, 000. 00 | |
| Total common stock | 1, 993, 595. 00 | |
| Total stock | | 2, 287, 945. 00 |
| Credit to capital surplus | | 9, 015, 596. 49 |

The real estate transferred to the new company pursuant to Article Ninth of the court's order and decree was, under the provisions thereof, made subject to the payment of taxes for the year 1936, which amounted to $24,283.92, and to the rights and liens for sums due or to become due on workmen's compensation claims against the old company in an amount not to exceed $75,000.

The liquidation value, as of March 31, 1936, of the surplus property (exclusive of raw materials, work in process, finished stock, supplies or other inventory, cash and accounts receivable) of the Willys-Overland Company which was not required for the future operation of the business, was appraised by West Brothers, Inc., at $1,268,131. Machinery and factory equipment included therein at a liquidation value of $44,088 was sold by the trustee between April

1, 1936, and August 28, 1936, and the remainder of such property was transferred to Realization Corporation pursuant to Article Seventh of the court's order and decree. For accounting purposes, this property and the other assets transferred to the Realization Corporation were reflected on the trustee's report and an accountant's report at the following net values:

| | | |
|---|---:|---:|
| Cash | | $1,977,561.59 |
| Real estate, machinery, factory equipment | | 1,224,043.00 |
| Investments in subsidiaries: | | |
| Wilson Foundry & Machine Co. | $1,000,000 | |
| Willys-Morrow Company | 78,500 | |
| Willys-Overland Branches, Inc. | 226,000 | |
| Willys-Overland Sales Co., Ltd. | 20,000 | 1,324,500.00 |
| Other securities | | 7,810.00 |
| Claims against closed banks | | 3,106.88 |
| Other assets | | 33,603.86 |
| Total assets | | 4,570,625.33 |

The real estate transferred to Realization Corporation pursuant to Article Seventh of the court's order and decree was, under the provisions thereof, made subject to liens and taxes payable to Lucas County, Ohio, in the amount of $380,633.76, and under Article Twelfth was made subject to the payment of workmen's compensation claims, if any, which might exceed the sum of $75,000, in the aggregate, with which the property transferred to Willys-Overland Motors, Inc., was charged, and also the payment and discharge of all unpaid obligations of each of the debtors and of the trustee, including all expenses of reorganization and costs of administration. The payments of amounts so charged amounted to $404,054.01, as follows:

| | |
|---|---:|
| Federal excise taxes | $37,427.01 |
| Lucas County intangible taxes | 39,750.00 |
| Court costs, legal, and trustee's fees | 326,877.00 |
| Total | 404,054.01 |

Prior to the submission of a proposed plan of reorganization of the Willys-Overland Company to the United States District Court having jurisdiction of the matter on July 24, 1936, D. R. Wilson, trustee of the old company, on July 9, 1936, represented to the court that in anticipation of the reorganization of the Willys-Overland Company it would be necessary and advisable to make certain improvements in the model of the Willys automobile and truck then being manufactured by the trustee; that such improvement would require the purchase of certain tools, dies, jigs, and other equipment

essential to the production of its 1937 model at a cost of approximately $480,000; and requested instructions with respect thereto. The court, by order dated July 9, 1936, authorized the expenditure of the requested $480,000 and instructed the trustee to purchase such equipment.

The Willys-Overland Company, as well as the petitioner, sold its automobiles through a distributor organization, i.e., a distributor was given a franchise for a specific territory in which such distributor had the exclusive right to sell the company's product at wholesale, and the exclusive right, subject to petitioner's approval, to appoint dealers within that territory who would sell and service the company's automobiles at retail. Thus, the wholesale contracts were between the manufacturer (petitioner) and distributor, and the retail contracts were between the distributor and the retailer. Both the petitioner's contracts with the distributors, and the distributors' contracts with the dealers were for 1-year periods and were subject to cancellation by either party upon 30-day notice. Each of the dealers submitted to the distributor a schedule showing by months an estimate of the number of automobiles he could sell during each month of the ensuing model year, and each of the distributors submitted the same type of estimate to the manufacturer. Except as to their estimate for the first month of the contract period, neither the distributors nor the dealers were legally bound by their respective contracts to purchase the number of automobiles so estimated. Some of petitioner's distributors appointed many dealers, whereas others appointed relatively few.

Prior to the commencement of the receivership in February 1933, the old company sold its automobiles through approximately 100 distributors. During the receivership, and the trusteeship which followed, 4 distributors represented the principal outlet for the automobiles manufactured under court authority. These 4 distributors accounted for approximately 70 per cent of the automobiles sold by petitioner during its 1937 model year, i.e., during the fiscal year ended September 30, 1937:

| | |
|---|---:|
| Walter E. Schott, Inc. (Ohio) | 11,000 |
| Willys Distributors, Inc. (California) | 11,000 |
| A. W. Pickett, Inc. (New York) | 4,000 |
| Willys Export Company | 12,000 |
| Total | 38,000 |

The remaining 87 distributors undertook to sell a total of 16,000 cars during 1937.

From August 9, 1937, to November 21, 1938, petitioner had franchise contracts with the indicated number of distributors as follows:

| Date | Number of distributors |
|------|------------------------|
| Aug. 9, 1937 | 91 |
| Aug. 24, 1937 | [1] 60 |
| Aug. 24, 1937 | [2] 15 |
| Oct. 31, 1938 | 65 |
| Nov. 21, 1938 | 99 . |

[1] Domestic.
[2] Foreign.

From November 1, 1937, until May 23, 1940, petitioner utilized the following number of active dealers:

| Date | Number of dealers |
|------|-------------------|
| Nov. 1, 1937 | 1,600 |
| Jan. 1939 | 661 |
| May 1939 | 700 |
| Oct. 3, 1939 | 1,259 |
| Jan. 22, 1940 | 1,788 |
| May 23, 1940 | 2,193 |

On November 27, 1936, the petitioner's president, David R. Wilson, reported to the board of directors that specifications on distributors' contracts to that date called for 110,564 automobiles for the 1937 model year and that uncancellable orders given by dealers for release within the following 3 months amounted to 31,503 automobiles. Petitioner had 135,403 car orders on hand on February 2, 1937.

The petitioner's actual sales of its 1937 model automobiles and trucks during its fiscal year ended September 30, 1937, were as follows:

|  | Passenger cars | Trucks | Chassis | Total |
|--|----------------|--------|---------|-------|
| Domestic | 54,893 | 971 | 3 | 55,867 |
| Foreign | 8,218 | 26 | 2,569 | 10,813 |
| Total | 63,111 | 997 | 2,572 | 66,680 |

The petitioner's actual unit sales during its fiscal year ended September 30, 1937, were reasonably close to a forecast in a report, dated April 13, 1936, prepared by Sanderson & Porter, Consulting Engineers, New York, New York, who were employed by the trustee of the Willys-Overland Company to make a study of that company's position in the automotive industry, and other matters, together with an estimate of income and expense which would be realized as a result of a proposed new model at proposed new prices. The report of Sanderson & Porter, as revised June 26, 1936, was submitted to the United States District Court on July 24, 1936, as a part of the trustee's report thereto in connection with the proposed plan of reorganization of the Willys-Overland Company. Among other things, it was stated in such report that Sanderson & Porter

had made a brief examination of the company's properties at Toledo, Ohio, Pontiac, Michigan, and Maywood, California, and that a limited field study had been made of the company's distributor and field organization and of the customer acceptance of its product. Based thereon, and upon cost and other data supplied to them, Sanderson & Porter reported under stated headings the following:

### PRODUCT

Since receivership the Company has manufactured only one line of small, four cylinder automobiles known as Willys "77" which includes three passenger models: coupe, standard and de luxe four-door sedans, and two truck models: panel delivery and pick-up. All of the Willys "77" models have identical chassis. A fair percentage of the production of all completed models, and some extra chassis have been built with right hand drive for export. The de luxe sedan has become the best selling model and comprises about half of current production. It differs from the standard sedan in being equipped with better upholstery, colored as against black fenders, and some additional trimmings and accessories.

  *   *   *   *   *   *   *

The records of the Company and our limited field check indicate that the performance of these cars is excellent; that maintenance service expense is minor.

Our field study also indicated that Willys cars met with highly satisfactory acceptance in the field for which they were designed mainly because of relatively low first cost and low cost of operation. The narrow tread was not regarded as undesirable for a small car and the body style appeared to be reasonably acceptable in a very low-priced car. There was some objection, however, to the small appearance and/or small capacity which in the main seems to be largely offset by economical performance.

### MARKET

Since the retirement of the Ford Model "T", the trend in the lower price automobile field, as represented by Ford, Chevrolet, and Plymouth, has been to increase the size, power, comfort, style, and price of the most popular cars, thereby virtually abandoning the former Model "T" field in which low cost was apparently the prime requisite. The Austin car was an experiment in the other direction; it proved to be too small and toy-like for general transportation requirements, and the Austin factory at Butler, Pennsylvania, has been closed during recent months with no apparent prospects of starting up again.

The small, four cylinder Willys 77 was introduced in 1933 to provide a car cheaper to buy and to operate than Ford, Chevrolet and Plymouth * * *.

Our field study indicates that there is an unsatisfied demand for a light, economical car for both private and business use such as the Company now builds, and if the present competitive price differentials can be substantially maintained, and the present satisfactory performance not seriously affected by model changes, we believe that there is a good market for the Company's product.

### EARNING POWER

It is obviously impossible to forecast the Company's earnings, because of the manifold uncertainties of any competitive industry. Instead, therefore, we have estimated the Company's earning power with the present line and also

with a proposed new line, on the basis of four postulated rates of operation.

The first rate selected by us contemplates the production and sale of 30,000 cars per year, which is but 9,000 more than were sold in 1935 under the handicap of receivership and is, therefore, a rate which might reasonably be attained with the present model by a reorganized company for its first year's operation. The second postulated rate was 45,000 cars per year, which we believe the new Company should have reasonable expectation of attaining after sufficient time has elapsed to enable it to improve its distributing organization. Rates of 60,000 and 70,000 cars per year, respectively, were selected to show the effect of increased production and sales on estimated earning power. The management believes that minimum annual sales of 60,000 cars can be attained in 1937, provided a new model can be put into production by November 1936.

We are of the opinion that expectation of sales in excess of 70,000 cars in the second year would not be justified. All estimates are based on a division between models given to us by the Company, substantially as follows: 56 per cent de luxe sedans, 17 per cent standard sedans, 9 per cent coupes, 12 per cent panel trucks, 4 per cent pick-up trucks, 2 per cent export chassis.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

At the request of the Company, we made estimates of the earning power with the proposed new model in production. We used the schedule of prices proposed for the new series of cars, trucks and chassis, and the estimated manufacturing costs applying thereto, furnished to us by the Company. We did not attempt to check the cost estimates. \* \* \*

On the basis of their study, and using cost and price data supplied by the trustee, Sanderson & Porter made the following estimates of the new company's earning power and stated their opinion that new cash of about $3,500,000 would be required to permit an operation at a rate of 60,000 cars per year:

| Annual rate of production | Earning power | |
| --- | --- | --- |
| | Estimated Apr. 13, 1936 | Revised estimate |
| 30,000 | $51,907 | $197,345 |
| 45,000 | 520,386 | 784,835 |
| 60,000 | 909,957 | 1,350,644 |
| 70,000 | 1,087,878 | 1,601,823 |

On August 24, 1937, petitioner's president reported to its board of directors that it had under contract 60 domestic distributors and 15 export distributors covering 61 foreign countries; that it had 3,005 dealers under contract; and that the corporation had a quota for the 1938 model year of 103,000 units to be sold in the United States and 22,000 to be sold for export trade. Attached to the minutes of the meeting of the board of directors at which such report was made is an addendum showing a list of 57 distributors and allotments of cars thereto totaling 126,240 units in the aggregate, and a summary showing 122,819 cars for domestic sale and 22,000 for export sale. The allotments to the four distributors which repre-

sented the principal outlets for the automobiles manufactured under court authority were as follows:

A. W. Pickett, Inc. (New York) _____ 9,010
Willys of Ohio (Walter Schott, Inc.) _____ 13,668
Willys Distributors, Inc. (California) _____ 18,000
Export _____ 22,000

Total _____ 62,678

In September 1937, petitioner's officers estimated its production of its new model 1938 automobiles and chassis, by months, during the period September 1937 through August 1938, would be as follows:

| Month | Total | Sedans | Coupes | Pickup trucks | Chassis |
|---|---|---|---|---|---|
| September 1937 | 5,225 | 4,321 | 880 | | 24 |
| October 1937 | 11,172 | 8,305 | 1,647 | 912 | 308 |
| November 1937 | 11,142 | 8,318 | 1,648 | 898 | 278 |
| December 1937 | 9,443 | 7,100 | 1,339 | 686 | 318 |
| January 1938 | 8,131 | 6,022 | 1,192 | 608 | 309 |
| February 1938 | 7,758 | 5,707 | 1,152 | 609 | 290 |
| March 1938 | 14,581 | 10,609 | 2,413 | 1,313 | 246 |
| April 1938 | 13,843 | 10,009 | 2,312 | 1,256 | 266 |
| May 1938 | 13,475 | 9,649 | 2,287 | 1,253 | 286 |
| June 1938 | 11,763 | 8,272 | 2,056 | 1,139 | 296 |
| July 1938 | 10,597 | 7,422 | 1,869 | 1,015 | 291 |
| August 1938 | 7,870 | 5,446 | 1,425 | 826 | 173 |
| Total | 125,000 | 91,180 | 20,220 | 10,515 | 3,085 |

The petitioner's 1938 model automobile was introduced in October 1937 and starting immediately and coincident with a recession in general business, there began to be a failure on the part of petitioner's distributors to take the quota of new cars assigned to them. Distributors such as Schott (Ohio), Pickett (New York), and Willys Distributors, Inc. (California), in which territories the major part of the petitioner's production of 1937 model automobiles had been sold, were experiencing difficulties in the sale of new automobiles. Between November 1937 and May 1938, the decrease in the orders received from Schott and Willys-Distributors, Inc., together accounted for approximately 50 per cent of the loss in petitioner's sales.

The decline in petitioner's sales of its 1938 model automobile was so rapid and unexpected that petitioner was unable to reduce its fixed overhead expense accordingly, and it also became overcommitted for purchases of materials, parts, etc.

At a meeting of the executive committee on October 31, 1938, it was reported that 65 distributors had been signed for the 1939 model year, with orders for 44,218 cars for the year, and that this covered about 60 per cent of the territory of the United States.

During the base period years the petitioner had four different

sales managers, viz, Fenn and Beardsley in 1937, Cowling in 1938, and in 1939 Golden. During such years, the petitioner's board of directors and its executive committee were constantly concerned about some plan of distribution whereby its sales could be increased.

On January 16, 1938, Delmar G. Roos entered the employment of petitioner as vice president in charge of engineering and continued in this office during all years here material. Prior to such employment, Roos had received over a period of approximately 30 years a vast amount of automotive engineering knowledge and experience a part of which was as chief engineer of the Marmon Motor Car Company where he had introduced a straight 8-cylinder engine; vice president in charge of engineering of the Studebaker Corporation where he designed one of its automobiles and introduced the steel-backed interchangeable insert-bearings in 1935 or 1936; and consultant to Studebaker Corporation and Rootes, Ltd., a large English motor combine, which produced the Hillman Minx, a 4-cylinder automobile.

In April 1938, petitioner employed as the director of its Research and Development Division, Donald D. Stone, a graduate mechanical engineer with about 25 years' experience in the automotive field, particularly in engine design for the Buick Division of the General Motors Corporation. Shortly after his employment, the petitioner employed Floyd Kishline, who also had previous automotive experience, as assistant chief engineer in charge of chassis engineering, and research and body engineering. He left petitioner's employment in November 1939.

Henry C. McCaslin was employed by petitioner in November 1939, replacing Floyd Kishline, as assistant chief engineer. McCaslin then had about 20 years' experience in mechanical engineering, about 15 years of which was in the automotive industry.

The engine used in petitioner's 1937 and 1938 model automobiles was a 4-cylinder L-head engine having 134-cubic-inch displacement which had been developed and initially adopted by the old company in about 1926. The engine design, which had been developed by the old company at an estimated cost of at least $3 million, was acquired by the petitioner in 1936, pursuant to the reorganization of the old company.

Sometime prior to February 21, 1938, Roos, petitioner's vice president in charge of engineering, made a study of the 1938 model car with the intention of improving it and recommended that consideration be given to the improvement of several items: Hypoid axle; changes in the hood; improvement of engine performance; the gearshift off the floor; changing of the steering gear; use of hydraulic brakes; and general analysis with a view to lower costs.

Accordingly, the president, on March 11, 1938, authorized the ex-

penditure of $20,000 for the improvement of the petitioner's motor, including the building of four experimental motors. Expenditures in excess of $15,112.55 were made in connection with the project between April 1938 and May 1939.

Two major deficiencies were found in petitioner's 1938 engine, namely, insufficient horsepower output and insufficient endurance, in addition to other undesirable qualities inherent in any 4-cylinder engine. The latter characteristics were a lack of balance consisting of (1) a vertical vibration which was undesirable in a passenger car, (2) the absence of torque overlap or lack of constant power supply, and (3) a torque reaction which is a low-frequency phenomenon displayed in 4-cylinder engines. Further, the engine was noisy and lacked smoothness in performance. The petitioner was the only major automobile producer in the United States then using a 4-cylinder engine in its automobile.

Other deficiencies in petitioner's 1938 engine which were noted in the examination were:

(1) The valves were not made of the best heat-resistant material and consequently burned due to poor camshaft design which made a proper valve adjustment impossible, and also caused the clearance between the valve tappet and valve stem to close, resulting in a tendency of the valve to burn when the engine was called upon to do its maximum work.

(2) The pistons were made of very heavy cast iron which caused carbon deposits, piston slaps, and the fracture of bearing supports.

(3) The inability to properly fit wristpins in the cast iron pistons caused an undesirable piston knock.

(4) The crankshaft was not counterweighted and was unbalanced, thereby causing an excessive bearing load which resulted in rapid bearing failure.

(5) The camshaft was poorly designed and was driven by a chain which tended to stretch by use and become prone to whip violently, inducing heavy stresses that caused the operation of the shaft to become very noisy.

(6) The spark advance operated improperly due to the stresses resulting from the chain-whip, causing the camshaft to turn irregularly and upsetting the spark input which in turn caused engine detonation, overheating, burned valves, and general loss of horsepower.

(7) The cylinder head gasket had a tendency to blow out and leak due to inadequate pressure on one side of the gasket because of an improperly placed center stud on the cylinder head.

(8) The operation of the water pump depended upon an unlubricated bronze bearing which would wear and permit an irregular orbit of the pumpshaft, resulting in leakage.

(9) The water jacket extended only part way down the side of the cylinder barrel resulting in improperly cooled pistons and pistonhead which affected the amount of endurance of the engine.

(10) The flywheel, which weighed 57 pounds, was too heavy and put an undue strain on the bearings, caused torque reaction, and induced crankshaft breakage.

(11) The Tillotson carburetor used with the 1938 engine was an air valve type which was practically obsolete in the industry. It was unreliable and of obsolete design.

(12) The crankcase leaked at the front and rear bearings and through the screw holes which held the oil pan to the crankcase.

(13) The vertical vibration of the engine caused a loosening and fatigue breakage of the brackets used in attaching the engine accessories such as the generator, air cleaner, oil filters, coils, etc., to the engine. Such vibration also had a tendency to unseat the needle valve in the carburetor which caused excessive waste of gasoline.

(14) The construction of the clutch assembly, plus the heavy flywheel, resulted in poor operation at high speeds.

The purpose of Delmar Roos, petitioner's vice president in charge of engineering, was to improve petitioner's engine so that it would be competitive with the engines used by its competitors in performance and endurance. The goal sought was about one-half horsepower per cubic inch of displacement, and to achieve an engine capable of operating about 200 revolutions per minute above its peak horsepower for 100 hours. Such an engine would be considered an acceptable commercial engine as judged by prevailing standards. In horsepower output, the goal was 60 to 65 horsepower.

These objectives were not fully achieved until December 1940, when a test engine was run for 100 hours at 4,400 r.p.m. without failure.

Petitioner made changes in its 1938 model engine in order to modernize it and make it acceptable in the 1939 model automobile, the most important of which were as follows:

(1) New cylinder head with new shape combustion chamber, 6.3 compression ratio, new location of center cap screw, new location and design of water outlet to take either bellows- or spring-type thermostat.

(2) New cylinder block, with full-length water jackets, modified inlet ports, relocated water pump, extra hubbard plugs in jacket, change in rear engine support flange, omission of exhaust valve seat inserts, relocation of center cap screw, increase in thickness of top cylinder deck, mirror finish on cylinder bores.

(3) New camshaft for greater silence, larger operating clearance, and more power.

(4) New valve lifter and new material in valves.

(5) New exhaust valves.

(6) New aluminum pistons then developed and in use in industry.

(7) New sealed power-Grand Seal Piston Rings.

(8) New connecting rod with locked wristpin.

(9) Changed oil holes and grooving in crankshaft to get better lubrication and eliminate oil leakage.

(10) New Schwitzer-Cummins water-pump fan and pulley.

(11) New exhaust manifold having heat control as released for 1938 production, but held up; more powerful thermostat spring.

(12) Tillotson carburetor modified for lower costs.

(13) New clutch and throwout mechanism.

(14) Change in weight of flywheel.

(15) Changed engine mounting and location thereof, mounted generator on rubber bushings, provided more flexible mounting for oil filters, changed mounting of starting motor, air cleaner, and ignition coil.

On June 27, 1938, the executive committee authorized the expenditure of $9,746.10 for the acquisition of factory tooling and the expenditure of a total of $71,869 for outside tooling for the following changes in the body of the new 1939 model automobile:

(1) New hood and louver construction.

(2) Alteration of front fender.

(3) New instrument panel.

(4) Redesign of body floor stamping to create tunnel in rear compartment.

(5) Alteration of running board.

(6) Addition of license, lamp, and bracket to rear deck door.

(7) Installation of outside hinges on rear deck door.

(8) Change to cam-type lock on rear deck door.

The executive committee, on June 27, 1938, authorized the expenditure of $27,839.70 for the acquisition of tooling necessary to the change in the chassis of the new 1939 automobile, as follows:

(1) Redesign of clutch throwout rods and levers.

(2) Moving rear axle back $3/4$ inch to center of rear springs.

(3) Changing front axle spring U-bolts from $3/8$-inch to $7/16$-inch diameter and axle pad to accommodate such change.

(4) Stamped front hangers for Monroe shackles.

(5) Better machining of rear axle housing.

(6) Change and rearrangement of machine line.

On August 22, 1938, the executive committee, upon being informed that the Ford Motor Company was going to use hydraulic brakes on its new 1939 model automobile, decided that petitioner would also adopt hydraulic brakes as standard equipment on petitioner's new 1939 automobile.

The engine used in the Willys automobile during the receivership

and by the petitioner in its 1937 and 1938 models was considered a competitive engine even though it did not include many current industry improvements. The 1939 engine was a vastly improved engine with a great increase in performance.

A comparison of the petitioner's 1938 model engine, before any of the changes initiated by Roos were reflected, with its 1939 model engine, which did reflect the changes which were completed prior to November of that year, discloses the following:

| Engine | Friction torque | Brake horsepower | Revolutions per minute | Foot pounds torque | Maximum foot pounds torque |
|---|---|---|---|---|---|
| 1938 | 27 | 47 | 3,300 | 74 | 94 |
| 1939 | 31 | 60½ | 3,600 | 82 | 105 |

Additional changes were made in petitioner's 1940 model engine, as follows:

(1) Developed 63 brake horsepower at 3,400 r.p.m.

(2) Adoption of the Carter carburetor then standard in the industry and readily available.

(3) Adopted friction spring drive for camshaft.

(4) Adopted clutch manufactured by Atwood Vacuum Machine Company.

(5) Modified the generator support bracket with newly developed rubber bushings.

(6) Adopted ignition coil manufactured by Electric Auto-Lite Company.

(7) Addition of forged counterweights to the crankshaft.

Petitioner investigated the need for and the possibility of procuring a different carburetor for its engine as early as May 1937. However, the petitioner continued to use the "Tillotson" carburetor until November 1938, at which time the executive committee granted authority to the purchasing department to procure a different carburetor. A contract was made with the Carter Carburetor Company, delivery to begin in February 1939, which date was occasioned by the outstanding commitments to the prior supplier for 10,000 carburetors.

On June 12, 1939, petitioner's engineering department recommended that it change from a chain drive to a gear drive for the camshaft since the gear being a solid connection obviated any problem of whip created by the chain being transferred to the camshaft. Such recommendation was rejected since sales did not then warrant the necessary expenditure of money for the required retooling.

The petitioner's 1941 model engine included the following additional changes:

(1) Adopted valve springs of variable pitch coils.

(2) Modified the engine mountings.

(3) Modified the Atwood clutch.

(4) Added starting motor bracket and steel-backed bearings to the connecting rods.

On August 1, 1941, the petitioner received a contract from the United States Quartermaster Corps for 16,000 ¼-ton, 4-wheel drive, military vehicles, later known as the jeep. By reason of this assured volume, the petitioner began using thin steel-backed interchangeable bearings on the connecting rods of the engines put into those vehicles. The use of the interchangeable bearing cut costs on the assembly line and aided maintenance in the field; however, because of the cost of the special precision machine tool required for the machining thereof, the petitioner had not introduced that change in the 1939 model engine, which it would have done but for its tight financial situation.

The majority of the changes in petitioner's 1938 model engine which were deemed necessary by Delmar Roos would have been incorporated in the 1939 model engine but for the lack of funds with which to make such changes.

The Consumers Union of the United States publishes a monthly magazine entitled "Consumers Union Reports" in which is reported a contemporary evaluation of various products tested by that organization for the benefit of its member-subscribers. Reflected in certain issues thereof were statistical comparisons of the several makes of automobiles classified as the "Economy Group."

The comparative ratings of the various automobiles in the so-called "Economy Group" for the model years 1937 to 1940, inclusive, as published by the Consumers Union, were as follows:

| | | *Model years* | | |
|---|---|---|---|---|
| | *1937* | *1938* | *1939* | *1940* |
| Best Buy_____ | Ford V-8 60 HP. Model 74 | Plymouth Business Model P-5 [1] | Overland 39 Speedway | Willys 440 DeLuxe Model and Speedway Model |
| Also Acceptable (in estimated order of merit). | Willys 4 Model 37 | Willys Standard | Willys 48 | Ford V-8 60 HP. |
| | | Ford V-8 60 HP. Chevrolet Master [1] | Overland DeLuxe Chevrolet Master 85 | Studebaker Champion Plymouth Roadking or DeLuxe |
| | | | Ford V-8, 60 HP. | Chevrolet Master or DeLuxe |
| | | | Plymouth Roadking, Model P-7EE Bantam | Bantam Master Coupe Bantam Coupe |

[1] With economy equipment—smaller carburetor and manifold and lower numerical rear axle ratio.

As a further result of the contemporary study of the automobile industry for the model years 1937 to 1939, inclusive, by the Consumers Union, the following observations were made in the monthly publications of that organization:

### Consumers Union Reports, March 1937

*Featuring This Year's Automobile* market is a new class of low-powered, "economy" cars. Only two are available in this class as yet—the *Willys* and the 60 H.P. *Ford.* They cost less to buy than other cars of standard seating capacity, and considerably less to operate. But they will do nearly all that is normally required of any car of higher power, and people for whom an automobile is a severe drain on the budget simply should not consider any other new car.

### Consumers Union Reports, February 1938

The automobile industry, as 1938 gets under way, is distinguished on three very special counts.

One, its dealers are burdened with the greatest stock of used cars they have had on their hands in years (estimated to be around 800,000).

Two, the new models, by and large, are only refinements of last year's models, with basic changes few and far between.

Three, prices on the 1938 models run about 10 percent over last year's.

The three factors together, in conjunction with the business "recession," explain why automobile sales have slid off badly—or rather, have simply failed to respond to the stimulus usually provided by new model introductions.

### Consumers Union Reports, February 1939

The automobile industry attempted to coast through 1938 largely with restyled 1937 models at higher prices. The 1939 cars, on the other hand, embody more improvements than usual. Prices this year average about 4% lower, but still remain above the 1937 levels.

No new cars underselling the "low-priced" field have appeared to compete with *Willys-Overland,* but *Pontiac* and *Oldsmobile,* using *Chevrolet* body shells, have extended their price lines downward toward the low-priced group. To increase his coverage of the market Ford has introduced the *Mercury* in the $900 class, while Hupmobile undersells its former lines with a model using a body produced with dies purchased from the old Cord Corp. Of these new models the new low priced *Pontiac Quality 6* appears likely to realize the largest sale.

\*     \*     \*     \*     \*     \*     \*

The 1939 engines show few changes which improve their operating economy. The higher compression ratio of the *Overland* engine will make the mileage of the *Overland Standard* better than that of the *Willys,* but the gain has been cancelled in the *Overland DeLuxe* by running the engine faster. \* \* \*

\*     \*     \*     \*     \*     \*     \*

*Overland 39 Speedway* \* \* \* Same size engine as in the *Willys,* but with many improvements which should lengthen its life, and with some which may improve its operating economy. The compression ratio is higher (6.35 to 1 instead of 5.70), but because it has aluminum pistons instead of iron, a better combustion chamber design and manifold heat thermostatically controlled, it should not require gasolines of high octane rating. \* \* \*

The public announcement dates of petitioner's new model Willys automobiles for the model years 1937 to 1941, inclusive, were as follows:

| Model year | Announcement date |
|---|---|
| 1937 | September 1936 |
| 1938 | October 1937 |
| 1939 | November 1938 |
| 1940 | September 1939 |
| 1941 | September 1940 |

The public announcement dates of the new model passenger cars of other automobile manufacturers for the model years 1937 to 1941, inclusive, were as follows:

| | Model year | | | | |
|---|---|---|---|---|---|
| | 1937 | 1938 | 1939 | 1940 | 1941 |
| Buick | 10/24/36 | 10/15/37 | 10/8/38 | 9/15/39 | 9/14/40 |
| Cadillac | 11/6/36 | 10/22/37 | 10/18/38 | 10/10/39 | 10/1/40 |
| Chevrolet | 11/7/36 | 10/23/37 | 10/22/38 | 10/14/39 | 9/21/40 |
| Chrysler | 11/10/36 | 10/27/37 | 10/15/38 | 9/27/39 | 9/21/40 |
| DeSoto | 11/3/36 | 10/23/37 | 10/22/38 | 10/11/39 | 10/2/40 |
| Dodge | 10/23/36 | 10/26/37 | 11/1/38 | 10/4/39 | 9/25/40 |
| Ford | 11/11/36 | 11/6/37 | 11/1/38 | 10/6/39 | 9/30/40 |
| Hudson | 11/1/36 | 10/12/37 | 11/12/38 | 9/15/39 | 9/4/40 |
| Lincoln | 10/10/36 | 10/27/37 | 10/15/38 | 10/10/39 | 9/20/40 |
| Mercury | None | None | 11/1/38 | 10/6/39 | 9/30/40 |
| Nash | 10/27/36 | 10/27/37 | 11/1/38 | 9/20/39 | 10/10/40 |
| Oldsmobile | 11/11/36 | 10/10/37 | 10/23/38 | 10/10/39 | 9/22/40 |
| Packard | 9/8/36 | 10/2/37 | 10/4/38 | 8/8/39 | 9/16/40 |
| Plymouth | 10/30/36 | 10/23/37 | 9/24/38 | 9/21/39 | 9/12/40 |
| Pontiac | 11/4/36 | 10/23/37 | 10/14/38 | 10/11/39 | 9/12/40 |
| Studebaker | 9/15/36 | 9/21/37 | 10/14/38 | 10/21/39 | 8/27/40 |

Petitioner's actual unit factory sales of passenger cars, trucks, and chassis, by months, for the fiscal years ended September 30, 1937 to 1940, inclusive, were as follows:

| | Fiscal year | | | |
|---|---|---|---|---|
| | 1937 | 1938 | 1939 | 1940 |
| October | | 6,182 | 354 | 4,892 |
| November | 122 | 4,059 | 2,205 | 4,091 |
| December | 3,804 | 2,315 | 3,224 | 2,641 |
| January | 6,476 | 1,078 | 1,736 | 3,033 |
| February | 8,316 | 988 | 1,981 | 1,630 |
| March | 9,691 | 2,711 | 2,724 | 3,200 |
| April | 9,537 | 1,842 | 1,712 | 2,493 |
| May | 7,777 | 1,033 | 1,229 | 2,601 |
| June | 7,050 | 757 | 1,189 | 2,303 |
| July | 6,761 | 639 | 1,008 | 1,678 |
| August | 4,538 | 795 | 513 | 811 |
| September | 2,608 | 1,108 | 1,788 | 41J |
| Total | 66,680 | 23,507 | 19,663 | 29,784 |

Petitioner's actual unit factory sales, by types, during the fiscal years ended September 30, 1937 to 1940, inclusive, were as follows:

|  | Fiscal year | | | |
|  | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|
| Passenger cars | 63, 111 | 18, 668 | 16, 156 | 25, 862 |
| Trucks | 997 | 2, 589 | 1, 588 | 2, 786 |
| Chassis | 2, 572 | 2, 250 | 1, 919 | 1, 136 |
| Total | 66, 680 | 23, 507 | 19, 663 | 29, 784 |

The actual unit factory sales set forth above were sold to or through domestic and export (including Canadian) distributors, as follows:

|  | Fiscal year | | | |
|  | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|
| Domestic: |  |  |  |  |
| Passenger cars | 54, 893 | 13, 201 | 12, 121 | 22, 912 |
| Trucks | 971 | 2, 112 | 1, 297 | 2, 540 |
| Chassis | 3 | 45 | 5 | 41 |
| Total domestic | 55, 867 | 15, 358 | 13, 423 | 25, 493 |
| Export: |  |  |  |  |
| Passenger cars | 8, 218 | 5, 467 | 4, 035 | 2, 950 |
| Trucks | 26 | 477 | 291 | 246 |
| Chassis | 2, 569 | 2, 205 | 1, 914 | 1, 095 |
| Total export | 10, 813 | 8, 149 | 6, 240 | 4, 291 |
| Total unit factory sales | 66, 680 | 23, 507 | 19, 663 | 29, 784 |

The factory sales of 19,663 units during the fiscal year ended September 30, 1939, consisted of 375 units of the 1938 model sold during October and November 1938, prior to the introduction of the 1939 model in November 1938, 2,610 units of the 1938 model (Model 48) and 14,930 units of the 1939 model, which were sold during the 1939 model year, and 1,748 units of the 1940 model (Model 440) which was introduced in September 1939.

The petitioner's production of automobiles and trucks during the base period years, including the units assembled at the Los Angeles plant operated by the Willys-Overland Pacific Company until May 31, 1937, when that company was liquidated and the plant became a division of petitioner, was as follows:

| Fiscal year ended Sept. 30— | Total production | Assembled at— | |
|  |  | Toledo, Ohio | Los Angeles, California |
|---|---|---|---|
| 1937 | 66, 755 | 54, 130 | 12, 625 |
| 1938 | 24, 083 | 21, 075 | 3, 008 |
| 1939 | 19, 796 | 17, 662 | 2, 134 |
| 1940 | 30, 330 | 25, 588 | 4, 742 |

The financial results of petitioner's operations during the base period years ended September 30, 1937 through 1940, were as follows:

| | Fiscal years ended Sept. 30— | | | |
|---|---|---|---|---|
| | 1937 | 1938 | 1939 | 1940 |
| Sales | $28,541,376.46 | $10,896,106.06 | $9,080,981.36 | $14,426,173.76 |
| Cost of sales at standard | 25,309,017.03 | 9,688,682.68 | 8,392,731.77 | 13,165,694.57 |
| Unabsorbed overhead and mat. variance | 841,331.85 | 992,033.73 | 1,137,899.12 | 542,366.05 |
| Total cost of sales | 26,150,348.88 | 10,680,716.41 | 9,530,630.89 | 13,708,060.62 |
| Gross profit | 2,391,027.58 | 215,389.65 | (449,649.53) | 718,113.14 |
| Expenses: | | | | |
| Administrative, purchasing and engrg. | 696,297.22 | 621,429.95 | 641,657.55 | 695,944.08 |
| Selling | 137,311.57 | 234,075.56 | 249,662.18 | 269,878.68 |
| Service | 135,879.63 | 58,771.35 | 39,887.01 | 59,357.78 |
| Parts | 58,229.45 | 134,526.48 | 110,162.40 | 116,152.86 |
| Advertising | 558,670.00 | 440,487.78 | 246,930.36 | 405,780.67 |
| | 1,586,388.27 | 1,489,291.12 | 1,298,300.40 | 1,547,114.07 |
| Net operating profit | 804,639.71 | (1,273,901.47) | (1,747,949.93) | (829,000.93) |
| Other income: | | | | |
| Discount on purchases | 82,143.47 | 22,136.26 | 20,692.62 | 31,457.65 |
| Salvage sales | 90,645.83 | 25,349.92 | 15,559.21 | 26,046.26 |
| Rent received | | 8,016.37 | 2,493.61 | 313.46 |
| Royalties | 2,022.62 | 1,211.80 | 1,858.30 | 2,075.00 |
| New car delivery income | 49,468.81 | (2,283.91) | (6,594.92) | (2,840.32) |
| Interest income | | 624.99 | | 181.57 |
| Miscellaneous | 11,373.67 | 7,280.96 | 13,191.21 | 9,493.44 |
| | 235,664.40 | 62,836.39 | 47,200.03 | 66,727.06 |
| | 1,040,304.11 | (1,211,065.09) | (1,700,749.90) | (762,273.87) |
| Other expenses: | | | | |
| Loss on sale of equipment | 3,049.14 | 8,880.59 | (306.73) | 1,125.67 |
| New car expense | 1,129.53 | 1,394.32 | 4,198.98 | 2,699.73 |
| Taxes-expenses R.E. not used in bus. | | 7,237.57 | 7,599.16 | 3,370.13 |
| Expense of changing design | 31,282.43 | 1,197.67 | | |
| Exhibition car expense | 144,764.88 | 12,968.01 | 23,717.22 | 361.43 |
| Interest on borrowed money | | 193.86 | 9,263.03 | 82,868.85 |
| Alterations and repairs—machy. and equip. | | 1,632.47 | | |
| Miscellaneous | 2,558.45 | 3,325.51 | 39,574.08 | 7,543.52 |
| Engineering and development | 70,649.53 | | | |
| Rearrangement expense | 166,304.18 | | | |
| | 419,738.14 | 37,530.00 | 84,045.74 | 97,969.33 |
| Profit before income taxes | 620,565.97 | (1,248,595.08) | (1,784,795.64) | (860,243.20) |

On March 30, 1939, the petitioner filed an application with the Reconstruction Finance Corporation for a loan of $2,500,000, of which $1,500,000 was to be used for working capital and the remaining $1 million was to be used for the expense of retooling for its 1941 model automobile. Such loan was approved on June 27, 1939. In its application petitioner stated that the causes of the losses which depleted its working capital were:

In October 1937, Distributors' contracts had been signed indicating a further substantial increase in sales over the preceding season. Total contracts of approximately 140,000 cars were reported by the Sales Department. High and increasing cost of labor with threatened shortage of material led to purchases

which proved excessive in the sharp recession which followed and involved some cars in obsolescence in the production of the 1939 model.

The unprecedented drop in 1938 in prices of used cars found many Willys-Overland dealers who also handled the higher priced independent cars, stocked with more expensive used cars taken in at higher prices while the price of all new cars was forced upwards at high cost of labor and materials. The direct result was competition from a glut of used cars being thrown directly into the market of Willys-Overland price class.

During the calendar year 1922, there were a total of 58 makes of new automobiles registered under the laws of the various States which were reported by name, and by 1941 all but 12 of these had disappeared from the new car registration lists. The 12 makes which were reflected in the registration lists of new automobiles in 1922, and also in the list of 17 makes of new automobiles so registered in 1941, were:

| | | | |
|---|---|---|---|
| 1. Buick | 4. Dodge | 7. Lincoln | 10. Packard |
| 2. Cadillac | 5. Ford | 8. Nash | 11. Studebaker |
| 3. Chevrolet | 6. Hudson | 9. Oldsmobile | 12. Willys |

The remaining five makes of automobiles so registered in 1941, but not in 1922, and the year of their introduction to automobile purchasers were:

| | | |
|---|---|---|
| 1. Chrysler (1924) | 3. DeSoto (1928) | 5. Mercury (1938) |
| 2. Pontiac (1926) | 4. Plymouth (1929) | |

The 46 makes of automobiles which appeared in the 1922 registration lists of new cars, but not in the 1941 lists, were last registered in the following years:

| *1922(7)* | *1925(9)* | *1927(4)* | *1932(1)* |
|---|---|---|---|
| Elgin | Apperson | Jordan | Essex |
| Grant | Cleveland | Moon | |
| King | Cole | Paige | *1934(1)* |
| Liberty | Columbia | Velie | Franklin |
| Mercer | Haynes | | |
| National | Kissel | *1928(8)* | *1936(2)* |
| Saxon | Lexington | Chandler | Lafayette |
| | Maxwell | Durant | Reo |
| *1924(7)* | Wescott | Gardner | |
| Case | | Jewett | *1937(2)* |
| Chalmers | *1926(3)* | Marmon | Auburn |
| Dort | Overland | Peerless | Pierce Arrow |
| Earl | Rickenbacker | Stearns-Knight | |
| Mitchell | Wills-Ste. Claire | Stutz | *1940(1)* |
| Stephens | | | Hupmobile |
| Winton | | *1931(1)* | |
| | | Oakland | |

Between the years 1922 and 1941, there were 23 makes of domestically produced new automobiles introduced and sold during the following years:

| Make | Years sold | Make | Years sold |
|------|-----------|------|-----------|
| Ajax | 1925 | Graham Paige | 1928–1929 |
| American-Austin | 1930–1934 | Gray | 1923–1925 |
| Anderson | 1924–1925 | H. C. S. | 1923–1924 |
| Bay State | 1923–1924 | LaSalle | 1927–1940 |
| Continental | 1929–1934 | Locomobile | 1924–1927 |
| Cord | 1931–1937 | R. & V. Knight | 1924 |
| Davis | 1923–1925 | Rollin | 1924–1925 |
| Diana | 1926–1927 | Star | 1923–1928 |
| Elcar | 1926 | Terraplane | 1932–1938 |
| Erskine | 1927–1929 | Wolverine | 1927 |
| Falcon-Knight | 1927–1928 | Yellow | 1923–1925 |
| Graham | 1930–1940 | | |

The total new car registrations during the calendar years 1922 to 1941, inclusive, were as follows:

| Year | Total registrations | Year | Total registrations |
|------|--------------------|------|--------------------|
| 1922 | 1, 568, 505 | 1932 | 1, 096, 399 |
| 1923 | 2, 487, 876 | 1933 | 1, 493, 794 |
| 1924 | 2, 830, 122 | 1934 | 1, 888, 557 |
| 1925 | 2, 967, 755 | 1935 | 2, 743, 908 |
| 1926 | 3, 228, 695 | 1936 | 3, 404, 497 |
| 1927 | 2, 623, 538 | 1937 | 3, 483, 752 |
| 1928 | 3, 139, 579 | 1938 | 1, 891, 021 |
| 1929 | 3, 848, 937 | 1939 | 2, 653, 377 |
| 1930 | 2, 626, 068 | 1940 | 3, 415, 905 |
| 1931 | 1, 908, 016 | 1941 | 3, 731, 166 |

New car registrations by makes, which indicate new car sales by domestic dealers, during the calendar years 1934 through 1941, and the percentage relationship of the sales of each make to the total, were as follows:

| Make | 1934 Number | 1934 Percentage | 1935 Number | 1935 Percentage | 1936 Number | 1936 Percentage | 1937 Number | 1937 Percentage | 1938 Number | 1938 Percentage | 1939 Number | 1939 Percentage | 1940 Number | 1940 Percentage | 1941 Number | 1941 Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General Motors Co:** | | | | | | | | | | | | | | | | |
| Buick | 63,067 | 3.34 | 87,635 | 3.19 | 160,687 | 4.72 | 205,304 | 5.89 | 166,380 | 8.8 | 218,995 | 8.25 | 295,513 | 8.7 | 308,615 | 8.27 |
| Cadillac | 4,899 | .26 | 6,692 | .24 | 11,766 | .35 | 11,234 | .32 | 10,639 | .56 | 13,090 | .49 | 21,965 | .63 | 60,242 | 1.61 |
| Chevrolet | 534,906 | 28.32 | 656,698 | 23.93 | 930,260 | 27.33 | 768,040 | 22.05 | 464,337 | 24.6 | 598,834 | 22.57 | 853,529 | 24.9 | 880,346 | 23.59 |
| LaSalle | 5,182 | .27 | 11,775 | .43 | 13,992 | .41 | 28,906 | .83 | 15,732 | .83 | 22,197 | .84 | 16,599 | .48 | | |
| Oldsmobile | 71,676 | 3.80 | 149,375 | 5.44 | 178,488 | 5.24 | 188,302 | 5.41 | 92,398 | 4.9 | 146,412 | 5.52 | 201,256 | 5.9 | 230,367 | 6.18 |
| Pontiac | 72,645 | 3.85 | 140,122 | 5.12 | 171,669 | 5.04 | 212,400 | 6.10 | 98,399 | 5.2 | 159,836 | 6.03 | 235,815 | 6.9 | 286,123 | 7.67 |
| | 752,375 | 39.84 | 1,052,297 | 38.35 | 1,466,852 | 43.09 | 1,414,186 | 40.60 | 847,885 | 44.8 | 1,159,364 | 43.70 | 1,624,677 | 47.6 | 1,765,693 | 47.32 |
| **Ford Motor Co:** | | | | | | | | | | | | | | | | |
| Ford | 530,528 | 28.09 | 826,519 | 30.12 | 748,554 | 21.99 | 765,933 | 21.99 | 363,688 | 19.2 | 481,496 | 18.15 | 542,755 | 15.9 | 602,013 | 16.14 |
| Lincoln | 2,061 | .11 | 2,370 | .09 | 15,567 | .46 | 25,242 | .72 | 16,991 | .9 | 19,940 | .75 | 21,004 | .6 | 18,769 | .50 |
| Mercury | | | | | | | | | 6,835 | .36 | 65,884 | 2.48 | 80,418 | 2.4 | 81,874 | 2.19 |
| | 532,589 | 28.20 | 828,889 | 30.21 | 764,121 | 22.45 | 791,175 | 22.71 | 387,514 | 20.5 | 567,320 | 21.38 | 644,177 | 18.9 | 702,656 | 18.83 |
| **Chrysler Corporation:** | | | | | | | | | | | | | | | | |
| Chrysler | 28,052 | 1.49 | 40,536 | 1.48 | 58,698 | 1.72 | 91,624 | 2.63 | 46,184 | 2.4 | 63,956 | 2.41 | 100,117 | 2.9 | 143,025 | 3.83 |
| DeSoto | 11,447 | .61 | 26,952 | .98 | 45,088 | 1.32 | 74,421 | 2.13 | 35,259 | 1.9 | 51,951 | 1.96 | 71,943 | 2.1 | 91,004 | 2.44 |
| Dodge | 90,139 | 4.77 | 178,770 | 6.51 | 248,518 | 7.30 | 255,264 | 7.33 | 104,881 | 5.5 | 176,585 | 6.65 | 197,252 | 5.8 | 215,563 | 5.78 |
| Plymouth | 302,557 | 16.02 | 382,985 | 13.96 | 499,580 | 14.68 | 462,268 | 13.27 | 286,241 | 15.1 | 348,807 | 13.15 | 440,093 | 12.9 | 452,187 | 12.12 |
| | 432,195 | 22.89 | 629,243 | 22.93 | 851,884 | 25.02 | 833,577 | 25.36 | 472,565 | 24.9 | 641,299 | 24.17 | 809,405 | 23.7 | 901,779 | 24.17 |
| **Hudson Motor Car Co:** | | | | | | | | | | | | | | | | |
| Hudson | 19,307 | 1.02 | 21,587 | .79 | 20,825 | .61 | 15,819 | .45 | 40,889 | 2.2 | 62,855 | 2.37 | 79,979 | 2.3 | 73,261 | 1.96 |
| Terraplane | 40,510 | 2.15 | 53,838 | 1.96 | 78,471 | 2.30 | 74,208 | 2.13 | | | | | | | | |
| | 59,817 | 3.17 | 75,425 | 2.75 | 99,296 | 2.91 | 90,027 | 2.58 | 40,889 | 2.2 | 62,855 | 2.37 | 79,979 | 2.3 | 73,261 | 1.96 |
| **Nash Motor Co:** | | | | | | | | | | | | | | | | |
| LaFayette | 9,301 | .49 | 17,445 | .64 | 16,304 | .48 | | | | | | | | | | |
| Nash | 14,315 | .76 | 17,739 | .65 | 26,766 | .79 | 70,568 | 2.03 | 31,814 | 1.9 | 54,050 | 2.04 | 52,883 | 1.5 | 77,824 | 2.09 |
| | 23,616 | 1.25 | 35,184 | 1.28 | 43,070 | 1.27 | 70,568 | 2.03 | 31,814 | 1.9 | 54,050 | 2.04 | 52,883 | 1.5 | 77,824 | 2.09 |

| Make | 1934 | | 1935 | | 1936 | | 1937 | | 1938 | | 1939 | | 1940 | | 1941 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percentage | Number | Percentage | Number | Percentage | Number | Percentage | Number | Percentage | Number | Percentage | Number | Percentage | Number | Percentage |
| Other Makes: | | | | | | | | | | | | | | | | |
| Auburn-Cord | 5,536 | .29 | 5,163 | .19 | 3,022 | .09 | 1,292 | .04 | | | | | | | | |
| Franklin | 360 | .02 | | | | | | | | | | | | | | |
| Graham | 12,887 | .68 | 15,965 | .59 | 16,439 | .48 | 13,987 | .40 | 4,139 | .22 | 3,660 | .13 | 1,856 | .05 | | |
| Hupmobile | 6,566 | .35 | 7,450 | .27 | 1,556 | .05 | 396 | .01 | 1,020 | .05 | 907 | .03 | 211 | .006 | | |
| Packard | 6,552 | .35 | 37,653 | 1.37 | 68,772 | 2.02 | 95,463 | 2.74 | 49,163 | 2.8 | 62,005 | 2.33 | 73,794 | 2.2 | 69,653 | 1.87 |
| Pierce-Arrow | 1,740 | .09 | 875 | .03 | 787 | .02 | 166 | | | | | | | | | |
| Reo | 3,854 | .20 | 3,894 | .14 | 3,146 | .09 | | | | | | | | | | |
| Studebaker | 41,560 | 2.20 | 39,573 | 1.44 | 67,835 | 1.99 | 70,054 | 2.01 | 41,504 | 2.2 | 84,660 | 3.19 | 102,281 | 3.00 | 114,331 | 3.07 |
| Willys | 6,676 | .35 | 10,439 | .38 | 12,423 | .36 | 51,418 | 1.48 | 13,012 | .69 | 14,734 | .55 | 21,418 | .62 | 22,102 | .59 |
| Miscellaneous | 2,334 | .12 | 1,858 | .07 | 5,294 | .16 | 1,441 | .04 | 1,516 | .10 | 3,016 | .11 | 5,254 | .14 | 3,867 | .10 |
| | 87,965 | 4.65 | 122,870 | 4.48 | 179,274 | 5.26 | 234,217 | 6.72 | 110,354 | 6.06 | 168,982 | 6.34 | 204,814 | 6.01 | 209,953 | 5.63 |
| Grand total—United States | 1,888,557 | 100.00 | 2,743,908 | 100.00 | 3,404,497 | 100.00 | [1]3,483,752 | 100.00 | 1,891,021 | 100.00 | [2]2,653,377 | 100.00 | 3,415,905 | 100.00 | 3,781,166 | 100.00 |

[1] Difference of 2 in addition not located.
[2] Difference of 493 in addition not located.

The unit factory sales of passenger cars by United States manufacturers in domestic and foreign markets during the calendar years 1922 to 1939, inclusive, and a computed index thereof, were as follows:

| Year | Domestic markets | | Foreign markets | | Total sales | |
|---|---|---|---|---|---|---|
| | No. of vehicles | Index 1922–1939 =100 | No. of vehicles | Index 1922–1939 =100 | No. of vehicles | Index 1922–1939 =100 |
| 1922 | 2,169,185 | 79.1 | 105,000 | 46.2 | 2,274,185 | 76.8 |
| 1923 | 3,449,658 | 126.2 | 175,059 | 77.0 | 3,624,717 | 122.4 |
| 1924 | 2,968,711 | 108.6 | 217,170 | 95.6 | 3,185,881 | 107.6 |
| 1925 | 3,419,072 | 125.0 | 316,099 | 139.1 | 3,735,171 | 126.2 |
| 1926 | 3,494,791 | 127.9 | 289,196 | 127.2 | 3,783,987 | 127.8 |
| 1927 | 2,604,491 | 95.3 | 332,042 | 146.1 | 2,936,533 | 99.2 |
| 1928 | 3,396,516 | 124.3 | 418,901 | 184.3 | 3,815,417 | 128.9 |
| 1929 | 4,136,305 | 151.3 | 451,095 | 198.5 | 4,587,400 | 154.9 |
| 1930 | 2,536,981 | 92.8 | 247,764 | 109.0 | 2,784,745 | 94.1 |
| 1931 | 1,838,786 | 67.3 | 134,304 | 59.1 | 1,973,090 | 66.6 |
| 1932 | 1,062,376 | 38.9 | 73,115 | 32.1 | 1,135,491 | 38.4 |
| 1933 | 1,475,357 | 54.0 | 98,155 | 43.2 | 1,573,512 | 53.1 |
| 1934 | 1,993,763 | 72.9 | 184,156 | 81.0 | 2,177,919 | 73.6 |
| 1935 | 3,041,877 | 111.3 | 210,367 | 92.6 | 3,252,244 | 109.8 |
| 1936 | 3,458,051 | 126.5 | 211,477 | 93.0 | 3,669,528 | 123.9 |
| 1937 | 3,643,386 | 133.3 | 272,503 | 119.9 | 3,915,889 | 132.3 |
| 1938 | 1,810,938 | 66.3 | 190,047 | 83.6 | 2,000,985 | 67.6 |
| 1939 | 2,702,181 | 98.9 | 164,615 | 72.4 | 2,866,796 | 96.8 |
| Averages: | | | | | | |
| 1922–1939 | 2,733,468 | 100.0 | 227,281 | 100.0 | 2,960,749 | 100.0 |
| 1936–1939 | 2,903,639 | 106.2 | 209,660 | 92.2 | 3,113,299 | 105.2 |

The foreign market sales include the assembly of cars overseas of parts made in the United States.

The Federal Reserve indexes, using a 1935–1939 average to equal 100, of total industrial production, total manufactures, and automobile factory sales for the years 1936 to 1941, inclusive, are as follows:

| Year | Industrial production total | Manufactures total | Automobile factory sales |
|---|---|---|---|
| 1936 | 103 | 104 | 116 |
| 1937 | 113 | 113 | 125 |
| 1938 | 89 | 87 | 65 |
| 1939 | 109 | 109 | 93 |
| 1940 | 125 | 126 | 116 |
| 1941 | 162 | 168 | 126 |

Petitioner's excess profits net income for each of the fiscal years ended September 30, 1941 through 1945, computed under the invested capital method provided under section 711(a)(2) of the 1939 Code, used in the determination of the excess profits tax liability reflected in the statutory notice dated January 26, 1950, was as follows:

| Fiscal year ended Sept. 30— | Excess profits net income |
|---|---|
| 1941 | None |
| 1942 | $10,636,736.81 |
| 1943 | 15,979,171.40 |
| 1944 | 31,014,247.31 |
| 1945 | 21,547,100.69 |

Excess profits net income, per statutory notice, for the fiscal years ended September 30, 1944 and 1945, were subsequently reduced by renegotiation adjustments as follows:

| Fiscal year ended Sept. 30— | Renegotiation adjustment |
|---|---|
| 1944 | $10,796,426 |
| 1945 | 3,406.616 |

Petitioner's excess profits net income for each of the base period years, computed under section 713 without the benefit of section 722, is as follows:

| Fiscal year ended Sept. 30— | Excess profits net income |
|---|---|
| 1937 | $711,880.75 |
| 1938 | (893,315.13) |
| 1939 | (1,815,321.98) |
| 1940 | (902,401.12) |
| Aggregate | (2,899,157.48) |
| Average | (724,789.37) |

The amount of money allowed the petitioner by the United States District Court for the Northern District of Ohio for the purpose of tooling its plant for the production of the 1937 model automobile and the effect upon its distributors and dealers of the economic recession that occurred in 1938 were not temporary economic events which depressed petitioner's earnings during the base period under section 722(b)(2).

Petitioner did not commence business during the base period within the meaning of section 722(b)(4) and no inadequate standard of earnings resulted from its reorganization and reincorporation in 1936. Petitioner's excess profits tax for the fiscal years ended September 30, 1942 to 1945, inclusive, computed without the benefit of section 722, is not excessive and discriminatory and its average base period net income is an adequate measure of its normal earnings.

#### OPINION.

Petitioner contends that it is entitled to excess profits tax relief under section 722(b)(2) and (b)(4) of the 1939 Code.[4]

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and

Petitioner claims that its earnings were depressed during the base period because of two temporary external economic circumstances unusual in its experience: (1) A restriction by the United States District Court for the Northern District of Ohio, Western Division, on the amount of money to be used for tooling its plant for the manufacture of the 1937 model automobile and (2) the effect of a severe economic recession that occurred during 1938 which depressed the petitioner's base period earnings.

The District Court allowed petitioner $480,000 for the acquisition of tools, dies, jigs, and other equipment essential to the production of its 1937 model, as requested by its trustee, David R. Wilson, immediately prior to its incorporation. Petitioner points out that there is testimony in the record before us to the effect that a complete factory retooling for the production of an automobile in 1936 would have cost from $3,500,000 to $4,500,000. It is the contention of petitioner that as a result of the restriction on its tooling expenditures imposed by the District Court it was compelled to market an inadequately engineered automobile that was unable to compete with the cars produced by other manufacturers.

We are unable to conclude from the record herein, however, that the amount of $480,000 allowed petitioner in 1936 actually was inadequate. This amount was formally requested by petitioner's trustee in receivership, David R. Wilson (who later became the first president of petitioner), immediately prior to its incorporation.

---

discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business \* \* \*

The automobile for which petitioner requested funds for manufacturing equipment in 1936 was the one that its engineers designed and its trustee intended to produce. Despite the asserted inadequacy in the tooling of its plant for the production of its 1937 model, petitioner sold more 1937 Willys-Overland cars than it anticipated and was so well satisfied with the design and marketability of that model that it planned the production of 125,000 cars of practically the same model for 1938. The record contains no evidence of an intention on the part of petitioner to make any substantial change in its product prior to the time it began to experience the effects of the business recession beginning late in 1937. It continued to use the same tooling in connection with its 1938 product. It did not begin tests on its engine until 1938. The engine was gradually improved over the next 2 or 3 years. Consequently, it does not appear that in 1936 or 1937 the petitioner actually regarded $480,000 as an inadequate amount for the tooling of its plant to manufacture the Willys-Overland car it had designed for production. There is no proof here that additional funds were not obtainable on petitioner's request. The record does not indicate that it would have engaged in more extensive retooling of the plant in 1936 regardless of the funds available for that purpose.

Even if the $480,000 were shown by the record herein to be an inadequate amount for the acquisition of necessary equipment for the production of its 1937 automobile, the fact that only that amount was available to petitioner for the purpose does not constitute an external temporary economic event under section 722(b)(2). The $480,000 allowed by the District Court was simply one of the existing assets with which petitioner commenced its operations in 1936. To state that petitioner had only that amount available for the tooling of its plant is simply to say that it began its operations in 1936 with limited resources. Consequently, even if that amount was inadequate, this fact would not constitute a temporary and unusual economic circumstance within the meaning of section 722(b)(2).

The distributor-dealer organization, which petitioner contends was weak and unable to withstand the effects of the general business recession in 1938, sold a larger percentage of new cars in 1938 than was sold by a presumably stronger distributorship and dealer organization in 1939, 1940, or 1941. It is doubtless true, as petitioner claims, that it was unable to obtain the strong distributors and dealers which it desired. This, however, appears to have been attributable to normal competition among distributors and dealers to acquire the best francises. Such competition clearly represents a normal and permanent business risk just as does competition affecting wages, prices, or sales. *Blue Diamond Coal Co.*, 31 T.C. 777.

Not every external cause of depressed earnings is a ground for relief under section 722. The existence of a general business recession in 1938 is not sufficient to justify excess profits tax relief under section 722(b)(2). *Brown Paper Mill Co.*, 23 T.C. 47; *Industrial Yarn Corporation*, 16 T.C. 681; Bulletin on Section 722, p. 17.

Petitioner further contends that it commenced business on August 20, 1936, within the meaning of section 722(b)(4), as a result of which its average base period net income is an inadequate standard of normal earnings. It claims that it did not reach by the end of the base period the level of earnings it would have reached had the qualifying commencement of operations occurred 2 years earlier. Petitioner maintains that because of its limited capital, it was compelled to produce an inadequately engineered automobile and had it commenced operations 2 years earlier so as to have had 2 additional years of experience in which to develop its product, the 1937 model car and subsequent models would have proved satisfactory to the consumer and, consequently, would have produced a higher level of earnings at the end of the base period.

Even though the petitioner did commence business in 1936 within the meaning of section 722, it does not appear from this record that an inadequate standard of earnings can be shown to have resulted therefrom since petitioner possessed many advantages over the usual new business. Such factors as the experienced management which had operated the company during part of its receivership, a product which largely was designed prior to the reincorporation of petitioner, established contacts in the automotive industry, experienced administrative personnel, and a sales organization which had been in existence for some time, all tend to show that petitioner did not begin the production of automobiles from "scratch." Consequently, even if the petitioner were qualified for relief under section 722 (b)(4) because of beginning business within the base period, it nevertheless has not shown that its 1939 level was not normal as a result of that factor.

It appears to us that the actual causes of the petitioner's low earning experience during the base period years were the general business recession that began in the last quarter of 1937 and continued through 1938, the highly competitive nature of the automotive industry, and the competitive inadequacies of its product. Even if the petitioner actually did commence business in 1936, as it contends, we are unable to find in the record evidence indicating that its experience during the base period would have been more profitable had it commenced business in 1934 rather than 1936.

Under section 722(b)(4), if petitioner's business did not reach by the end of the base period, the earning level it would have reached

had it commenced or changed the character of its business 2 years earlier, it may "push back" 2 years such commencement or change in character and utilize the increased level of earnings which would have resulted from 2 additional years of operation.

The "push-back" provisions of section 722(b)(4) clearly contemplate that a taxpayer qualifying thereunder must show that as a result of the commencement or change in the character of its business which entitles it to relief under section 722(b)(4), its level of earnings increased, and in such measure that the full extent of the increase had not been realized by the end of the base period. Here, however, the record clearly discloses a consistently declining earning experience during the base period years. Only in 1937 did petitioner's operations produce a profit. Petitioner's earnings (or losses) for the fiscal years ended September 30, 1937 to 1940, inclusive, were as follows:

| Year | Amount |
|------|--------|
| 1937 | $620,565.97 |
| 1938 | (1,248,595.08) |
| 1939 | (1,784,795.64) |
| 1940 | (860,243.20) |

There is no evidence before us indicating that had petitioner commenced business in 1934 rather than in 1936 it would have been able to reverse, or even improve, its earning experience. During 1934, the old company showed a net loss of $952,867, and its experience during 1935 and 1936 showed losses of $301,180 and $132,489, respectively. Petitioner's competitive position in the automotive industry likewise consistently declined during the base period years. Its percentage share of total new car sales (produced and sold in the United States) during the years 1937 to 1940, inclusive, was as follows:

| Year | Percentage |
|------|-----------|
| 1937 | 1.48 |
| 1938 | .69 |
| 1939 | .55 |
| 1940 | .62 |

During the model year 1939 petitioner's competitive position moved downward, whereas the economic trend of the automotive industry in general moved upward. The record herein fails to indicate that had petitioner begun business in 1934 rather than 1936 it would have been able to improve its relative competitive position in the automobile industry.

Section 722(b)(4) requires that in computing a constructive average base period net income for a qualified taxpayer, if it is shown that by the end of the base period his net income has not reached the level it would have reached had he begun business or changed

the character of his product 2 years prior to the date on which those events actually occurred, he is to be deemed to have begun his business or changed the character of his product 2 years prior thereto. However, other factors bearing upon his base period experience are not automatically required to be pushed back 2 years but their push-back depends upon proof of the likelihood of the earlier occurrence of such other factors. The general business recession of 1938 is not such a factor as may be pushed back. The highly competitive nature of the automobile industry is a factor which existed throughout the base period and for more than 2 years prior thereto. To push back 2 years prior to the time of their actual occurrence the improvements to petitioner's product and any improvement in its distributor-dealer organization which may have occurred requires adequate proof, the burden thereof being upon the petitioner. It is clear from this record that the improvements in petitioner's product were the direct result of and depended upon its employment of the particular members of the engineering profession referred to in our Findings of Fact. That such engineers would have been available for such improvement 2 years prior to the time they were employed is not at all clear from the record, and, to that extent, petitioner has failed in its burden of proof. To that extent also it has failed to show that the improvement in its product would have occurred 2 years prior to the actual date thereof. The inadequate distributor-dealer organization was a factor related in part to its noncompetitive product and in part to its lack of operating capital. Even with the improvement in petitioner's product occurring 2 years prior to the date of the actual improvement, the record indicates petitioner would still have occupied a disadvantageous position with respect to the sales of its competitors, for the record indicates that 1938, 1939, and 1940, the first years of sales of "improved" automobiles, were loss years and that 1937, the last year of sales of the "unimproved" automobile, was the last year during the base period in which petitioner showed a profit. We do not feel there is an adequate showing here that with a noncompetitive product and inadequate financing petitioner would have been able to improve its automobile distributor-dealer organization either quantitatively or qualitatively 2 years prior due to the competition it would have met from its competitors for such personnel. Consequently, the general business recession, the highly competitive nature of the automobile industry, and the inadequate distributor-dealer organization are factors which would have adversely affected petitioner during the base period years regardless of the time when it commenced business.

Petitioner therefore has failed to establish that if it had commenced business in 1934 rather than 1936, under the 2-year "push-

back" provision of section 722(b)(4), its earning level at the end of the base period would have been any greater than its actual earning level.

The petitioner has failed to establish that it is qualified for excess profits tax relief under either section 722(b)(2) or (b)(4).

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

OPPER, *J.*, dissents.